REVISED NOVEMBER 7, 2002

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-31179

KYLE M. HAMILTON,                                                    Plaintiff,

versus

UNITED HEALTHCARE OF LOUISIANA, INC.,                     Defendant.

KYLE M. HAMILTON,                                          Plaintiff-Appellant,

versus

HEALTHCARE RECOVERIES, INC.,                       Defendant-Appellee.

Appeals from United States District Court
for the Eastern District of Louisiana

November 1, 2002

Before DAVIS, EMILIO M. GARZA, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Kyle M. Hamilton appeals from the dismissal of his Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq. (1997), claim against Healthcare Recoveries, Inc. ("HRI"), as well as from the district court's determination that it lacked diversity jurisdiction. He also appeals from the district court's refusal to allow him to amend his complaint. For the following reasons, we REVERSE in part, AFFIRM in part, and REMAND for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

In October of 1999, Hamilton was seriously injured in a single-vehicle automobile accident in which he was a passenger. As a result of the accident, Hamilton required medical and other treatment. Defendant, United Healthcare of Louisiana, Inc. ("United"), had in force a group health plan, offered through Hamilton's father's employer, pursuant to which Hamilton was insured as a dependent. Pursuant to that coverage, United paid for certain of the medical and other services necessitated by the accident, allegedly totaling in excess of $100,000. At the time of the accident, Hamilton's father also had in effect uninsured and/or underinsured motorist ("UM") coverage pursuant to two polices with State Farm Insurance Company ("State Farm"). State Farm paid nearly $250,000 in UM benefits and $5,000 in MedPay benefits to Hamilton pursuant to those policies. Shortly thereafter, HRI, acting pursuant to its contract with United,[1] began sending notices to Hamilton's father and State Farm in an attempt to enforce subrogation rights that United claimed to have against any of the proceeds that Hamilton might receive from third parties, including his own

---

[1] HRI provides subrogation enforcement services for insurers such as United pursuant to a contractual agreement with the insurer. HRI and United are wholly separate business entities with no common ownership.

insurer State Farm. State Farm, through Hamilton's counsel, subsequently paid $57,757.06 out of the $250,000 UM policy proceeds, to which Hamilton would have otherwise been entitled, to HRI on behalf of United. Hamilton then retained new counsel who attempted to recover the monies that United had obtained from State Farm. On February 2, 2001, counsel sent United a letter outlining in detail why Louisiana Revised Statutes Sections 22:2006(7) and 22:663 precluded the type of subrogation claims that United had made against the State Farm proceeds. Attached to that letter was a copy of a state court petition. Hamilton's state lawsuit sought to recover the funds paid to United through HRI and asked the Court to enjoin any further attempts by United to either coordinate benefits or subrogate claims to any future proceeds under the State Farm policies. United removed the case to federal court alleging that ERISA completely preempted Hamilton's state law claims. After United removed, Hamilton filed a putative class action, naming HRI as defendant. In that suit, Hamilton alleged that HRI's acts during its recovery of funds from himself and others violates the FDCPA, as well as the Louisiana Unfair Trade Practices Act, LA. REV. STAT. ANN. § 51:1401, et seq. (West 1987) ("LUTPA"). The two cases were subsequently consolidated and the defendants in both cases filed motions to dismiss. Thereafter, the district court remanded the United suit to state court. Hamilton v. United Health Care of La., Nos. Civ. A. 01-585 & 01-650, 2001 WL 536300, at * 7 (E.D. La. May 17, 2001). The district court then considered HRI's Motion for Judgment on the Pleadings and Alternative Motion for Summary Judgment, which the court treated as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). By an order entered on July 17, 2001, the motion was granted in part, and the court dismissed Hamilton's FDCPA claim with prejudice, finding that Hamilton failed to state a claim because HRI was not collecting a "debt" under the FDCPA.

On August 21, 2001, the district court concluded that no independent basis for federal subject matter jurisdiction existed over the remaining state law claims because Hamilton failed to establish that the amount in controversy exceeded $75,000 for purposes of diversity jurisdiction. The court refused to exercise supplemental jurisdiction over the state law claims. As such, the state law claims were dismissed without prejudice. Hamilton then filed a Motion for Reconsideration and Motion for Leave to File a Supplemental and Amended Complaint seeking to add new theories of recovery in order to cure the amount-in-controversy defect. The district court denied these motions. In doing so, it concluded that the proposed amendments to Hamilton's complaint would not cure the amount in controversy defect. Judgment was entered and Hamilton appealed.

## STANDARD OF REVIEW

We review a Rule 12(b)(6) dismissal *de novo*, accepting all well-plead facts as true. Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002). Questions of fact are viewed in the light most favorable to the plaintiffs, and questions of law are reviewed *de novo*. Mowbray v. Cameron County, Tex., 274 F.3d 269, 276 (5th Cir. 2001). "Rule 12(b)(6) motions should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Castro Romero v. Becken, 256 F.3d 349, 353 (5th Cir. 2001) (internal quotations and citations omitted).

## DISCUSSION

The FDCPA was enacted in part "to eliminate abusive debt collection practices by collectors." 15 U.S.C. § 1692(e) (1997). "As such, the FDCPA enumerates several practices considered contrary to that goal, and forbids debt collectors from taking such action." Poirier v. Alco Collections, Inc., 107 F.3d 347, 349 (5th Cir. 1997). For the FDCPA to apply, the obligation at issue must qualify as

4

a "debt," defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." § 1692a(5).

The district court dismissed Hamilton's FDCPA claim pursuant to Rule 12(b)(6) after concluding that the subrogation claim that HRI sought to enforce on behalf of United was not a "debt" within the meaning of the FDCPA. The court began its analysis by noting that several key elements of the term "debt" appear to be present in this case. The court concluded that Hamilton entered into a consensual "transaction" for "insurance" and purchased that insurance for "personal or family use" for which Hamilton was "obligated to pay money" to United if its subrogation claim was valid. The court found that the question of whether Hamilton's obligation to pay "arises out of" his transaction with United to be more problematic. The court recognized that "but for" Hamilton's health insurance contract with United, his recovery on the UM proceeds would create no obligation. However, in rejecting Hamilton's argument that the "debt" arose out of his contract with United, the court relied on Garner v. Augustine, Kern & Levens, Ltd., No. 93 C 5968, 1994 WL 48589 (N.D. Ill. Feb. 16, 1994). In Garner, Health Care Services Corporation ("Health Care") administered group health and welfare benefit plans for a number of employers, including Garner's employer. 1994 WL 48589, at *1. Garner was a member of that plan. Garner's daughter was injured and Health Care paid medical benefits to cover her medical care. Health Care filed suit for reimbursement of the benefits paid after Garner refused to respond to Health Care's requests for information, which would allow it to assess whether it had any reimbursement rights by reason of Garner's recovery from a third party, or to subsequent letters from Health Care's counsel. When Health Care's counsel learned that

5

there was no right of reimbursement, the suit was voluntarily dismissed. Garner then filed a claim against the law firm representing Health Care, and one of its partners, under the FDCPA and state law. The district court held that Health Care's reimbursement claim against its insured was not a "debt" for purposes of the FDCPA. Id. at *2-3. The court reasoned that the inclusion of "debts" relating to insurance in § 1692a(5) was "obviously aimed at a consumer who contracts for insurance coverage and then does not pay the premium." Id. at *2. The court further concluded that the FDCPA was "*not* intended to cover the situation here, where an employee or his or her beneficiary under an employee benefit plan has received benefits that may give rise to a reimbursement obligation under that plan, then fails to respond to the plan's bona fide inquiries as to the facts that bear on the existence or nonexistence of the employees' or beneficiary's duty of reimbursement, so that the insurer is forced to sue." Id. To hold otherwise, the court concluded, "would unduly strain the normal meaning of the language that has been used by Congress" in the FDCPA. Id.

Based on Garner, the district court concluded that a contractual subrogation claim, while in fact "arising out of" the contract of insurance, is not the kind of payment obligation that Congress intended when it created the FDCPA for the protection of consumers.

Hamilton contends that HRI's claims against Hamilton "arise[] out of a transaction in which the . . . insurance [that is] the subject of the transaction [is] primarily for personal, family, or household purposes." § 1692a(5). He asserts that the district court erred by failing to find that HRI's enforcement of United's contract-based subrogation rights for reimbursement of benefits paid by United as Hamilton's group health insurer constitutes a "debt" under § 1692a(5). To support this position, Hamilton cites Pollice v. Nat'l Tax Funding, L.P.. 225 F.3d 379, 401 (3d Cir. 2000) ("[T]he plain meaning of section 1692a(5) indicates that a 'debt' is created whenever a consumer is obligated

6

to pay money as a result of a transaction whose subject is primarily for personal, family or household purposes."). Further, he argues that the district court's determination that the contractual subrogation claim was too attenuated from the original purchase of insurance to be a "debt" under the FDCPA is contrary to the broad protections afforded by the FDCPA.

Hamilton claims that Garner is distinguishable because it involved a self-funded plan, whereas Hamilton's health plan is an insured plan, and here, Louisiana Revised Statute Section 22:663 prohibits United from seeking reimbursement. He argues that Garner's limitation on the scope of "debts"–i.e., its conclusion that the FDCPA's inclusion of insurance was meant to address only non-payment of premiums by an insured–was based upon the erroneous assumption that there must be an extension of credit to the consumer.

Additionally, Hamilton claims that his purchase of the United insurance policy is the consumer transaction that gave rise to United's obligations to pay medical benefits and its alleged right to seek reimbursement out of the proceeds of his recoveries against third parties. In support of his claim that the reimbursement obligation arose from the purchase of insurance, Hamilton relies on Brown v. Budget Rent-A-Car Sys., Inc., 119 F.3d 922 (11th Cir. 1997). In Brown, Brown rented a truck and dolly from Budget, and also paid for Loss Damage Waiver ("LDW") protection. Id. at 923. While operating the truck, Brown ran into an overpass, and Budget sought reimbursement from Brown and his insurance company. Brown's insurance carrier paid for damage to the truck, but Brown refused to pay the deductible or loss of use fees because he believed they were encompassed by the LDW. Budget contended that LDW coverage did not apply and that Brown violated the restrictions clause in the rental agreement, and retained collection agents to initiate collection activities against Brown. Brown filed suit against the collection agents under the state law and the FDCPA, and the district

7

court dismissed the complaint pursuant to Rule 12(b)(6). The court found that because the alleged obligations did not arise from an "extension or offer of credit," there was no "debt" as defined by the FDCPA. Id. at 924. On appeal, the Eleventh Circuit held that as long as the consumer transaction creates an obligation to pay, a "debt" is created, and that the extension of credit is not a prerequisite to existence of a "debt" under the FDCPA. Id. The court concluded that "Budget's assertion that Brown is obligated as a result of a consumer transaction suffices to bring the obligation" within the term "debt." Id.

HRI counters that there is no "debt" within the definition of the FDCPA because the "subject of the transaction" from which the obligation to pay arose is not "primarily for personal, family or household purposes." § 1692a(5). Contrary to Hamilton's assertion that the consumer "transaction" was the purchase of insurance, HRI claims that Hamilton's reimbursement obligation arose out of the automobile accident and his subsequent recovery of money from a third party. Further, HRI asserts that Garner is directly on point, holding that the FDCPA does not apply to subrogation/reimbursement claims because they do not arise out of a consumer transaction. HRI claims that, like in Garner, its August 29, 2000 letter was designed to determine whether there was a reimbursement obligation, not as an attempt to collect an alleged debt because the reimbursement claim did not arise out of a consumer transaction.

Further, citing Hawthorne v. MAC Adjustment, Inc., 140 F.3d 1367, 1372 (11th Cir. 1998), HRI asserts that Brown is distinguishable because it concerned whether the FDCPA requires an extension of credit and did not address whether the alleged debt arose pursuant to a consumer "transaction." In Hawthorne, the Eleventh Circuit held that a debt arising from tortious conduct on the part of the defendants does not constitute a consumer transaction for purposes of the FDCPA.

8

Id. at 1373.  In discussing its holding in <u>Brown</u>, the court stated in part as follows:

> We held that the FDCPA does not require the extension of credit to be applicable to an obligation.  We did not consider the question of whether the obligation at issue in <u>Brown</u> involved a "transaction" under the FDCPA.  It is clear, however, that the facts delineated in <u>Brown</u> do not exclude the possibility that the obligation in that case constituted a "debt" under the FDCPA, as Brown's obligations arose at least in part out of a business transaction where Brown contracted for what appear to be personal services (the truck rental and the loss damage waiver protection).

Id.  Because no such "transaction"–i.e., contract, business, or consensual arrangement–occurred in <u>Hawthorn</u>, the court held that <u>Brown</u> did not require the court to conclude that the tort obligation at issue was covered by the FDCPA.  <u>Id.</u>

As with all issues of statutory interpretation, the appropriate place to begin our analysis is with the text itself.  <u>Hughey v. United States</u>, 495 U.S. 411, 415 (1990).  We agree with the Seventh Circuit's determination that the FDCPA's definition of "debt" is plain.  <u>Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.</u>, 111 F.3d 1322, 1324 (7th Cir. 1997).  The definition is not "'beset with internal inconsistencies [or] burdened with vocabulary that escapes common understanding.'"  <u>Id.</u> (quoting <u>EEOC v. The Chicago Club</u>, 86 F.3d 1423, 1434 (7th Cir. 1996)).  In the absence of ambiguity, our inquiry ends with the text itself.  As the <u>Bass</u> court noted:

> [T]he plain language of the Act defines "debt" quite broadly as "any obligation to pay arising out of a [consumer] transaction."  In examining this definition, we first focus on the clear and absolute language in the phrase, "any obligation to pay." Such absolute language may not be alternatively read to reference only a limited set of obligations. . . . As long as the transaction creates an obligation to pay, a debt is created.

Id.

A fundamental canon of statutory construction instructs that in the absence of a

statutory definition, we give terms their ordinary meaning. Perrin v. United States, 444 U.S. 37, 42 (1979). " 'Arising out of' are words of much broader significance than 'caused by.' They are ordinarily understood to mean 'originating from[,]' 'having its origin in,' 'growing out of' or 'flowing from,' or in short, 'incident to, or having connection with.' " Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co. of Wisc., 189 F.2d 374, 378 (5th Cir. 1951); see also BLACK'S LAW DICTIONARY 102 (7th ed. 1999) (defining "arise" as originating or stemming from). Moreover, the ordinary meaning of the term "transaction" is a broad reference to many different types of business dealings between parties, and does not connote any specific form of payment. Bass, 111 F.3d at 1325 (citing WEBSTER'S NEW WORLD DICTIONARY 1509 (2d ed. 1986) (defining "transaction" simply as "a business deal or agreement")). We cannot avoid the inescapable conclusion that the plain meaning of "debt" encompasses the funds owed in this case. There is no question that the obligation to pay arose out of Hamilton's transaction of purchasing insurance. HRI is simply incorrect in its assertion that the obligation to pay arose out of a tortious act. Hawthorne itself suggests that Hamilton's obligations arose out of a consumer transaction for purposes of the FDCPA. As opposed to Hawthorne, where Hawthorne's obligations arose from tort law, Hamilton's obligations arose from a business transaction where Hamilton contracted for personal and family services, i.e., insurance. Moreover, the plain meaning of "arising out of" as "stemming from" leads us to conclude that the obligation to pay arose from the contract/transaction for insurance.

The district court and Garner's interpretation of the definition of "debt" is too narrow. As the Supreme Court stated in Hubbard v. United States, we are prohibited from reading

10

into clear statutory language a restriction that Congress itself did not include. 514 U.S. 695, 703 (1995) ("[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it." (internal quotations and citation omitted)).

Finally, while "Fifth Circuit law is crystal clear that when, as here, the language of a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history," our review of the legislative history brings forth nothing that contradicts our statutory interpretation. See Guilzon v. Comm'r of Internal Revenue, 985 F.2d 819, 823 n.11 (5th Cir. 1993). Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope. See S. REP. NO. 382 at 4 (1977) ("In addition to [the] specific prohibitions, this bill prohibits in general terms any harassing, unfair, or deceptive collection practice. This will enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed."), reprinted in 1977 U.S.C.C.A.N. 1695, 1698; Wright v. Fin. Serv. of Norwalk, Inc., 22 F.3d 647, 650 (6th Cir. 1994) (en banc ) (explaining that Congress wrote broad language into the FDCPA to forestall abusive practices by debt collectors). For these reasons, and because we agree with the Bass court's conclusion that the meaning of "debt" is clear, we hold that the district court erred in concluding that Hamilton's obligation to pay HRI did not fall under the FDCPA. See Bass, 111 F.3d at 1325.

HRI next offers an alternative argument in support of the district court's Rule 12(b)(6) dismissal of Hamilton's complaint. HRI contends that it is not a "debt collector" within the

11

meaning of the statute. Instead, it maintains that it is excluded pursuant to the exemption set forth in § 1692a(6)(F)(iii), which states that a "debt collector" does not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such a person." Hamilton vigorously disagrees.

For purposes of dealing with this argument, we must remain within the bounds of review permitted for a dismissal pursuant to Rule 12(b)(6). Although HRI filed a motion for summary judgment, the district court explicitly stated that it was dismissing the case on 12(b)(6) grounds. The district court commented on HRI's alternative "debt collector" argument; however, its decision was in no way predicated on it. When dealing with HRI's argument, the court noted that it "need not address the parties' arguments on the 'debt collector' issue" because the "debt" issue was dispositive. Hamilton v. United Healthcare of La., Nos. Civ. A. 01-585 & 01-650, 2001 WL 812076, at *4 (E.D. La. July 16, 2001).

After considering the district court's opinion, the parties' contentions, and the particular language of the statutory exclusion in dispute, we conclude that further appellate review is foreclosed by Rule 12(b)(6). The rule constrains us to scrutinize the complaint only. Resolution of the "debt collector" issue in this case is clearly tied to a determination of the circumstances surrounding the inception of the debt. Accordingly, we REMAND to the district court for further consideration of this issue.

Finally, Hamilton urges that the court erred in dismissing its remaining claims because diversity jurisdiction existed. HRI does not dispute that the parties are diverse; instead, it maintains that Hamilton has failed to meet the amount-in-controversy requirement. The crux

12

of Hamilton's argument is that attorneys' fees will raise the amount-in-controversy well above $75,000.

The district court noted that attorneys' fees may be imputed to a class representative; however, it also observed that we have held that imputing fees to a class representative is only permitted when a statute explicitly provides for attorneys' fees. Graham v. Henegar, 640 F.2d 732, 736 (5th Cir. 1981). Further, when a statute awards attorneys' fees to the named plaintiffs in a class action, the fees are attributed solely to the class representatives. In re Abbott Labs., 51 F.3d 524, 526-27 (5th Cir. 1995); § 1692k(a)(B), (a)(3). Since the court had already dismissed the FDCPA claim, the court focused on the remaining statutory claim, the LUTPA claim. Concluding, correctly, that the LUTPA does not allow class action claims, and that Hamilton's personal fees would not be enough to push Hamilton above the amount-in-controversy requirement, the court held that it did not have diversity jurisdiction. We find no error in this assessment.[2]

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's determination that the funds at issue in this case do not qualify as a "debt" under the FDCPA and REMAND for further proceedings not inconsistent with this opinion. We also AFFIRM the district court's decision that diversity jurisdiction did not exist in this case.

REVERSED in part, AFFIRMED in part, and REMANDED.

---

[2] We also find nothing erroneous in the district court's decision to deny Hamilton's request to amend his complaint. Foman v. Davis, 371 U.S. 178, 182 (1962) (explaining that leave to amend need not be given when amendment would be futile).

13

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's conclusion that the district court correctly dismissed Hamilton's remaining claims for lack of subject matter jurisdiction. In addition, I agree that it would be inappropriate for us to rule on the issue of whether Healthcare Recoveries, Inc. ("HRI") constitutes a "debt collector" under the Fair Debt Collection Practices Act ("FDCPA"). I cannot, however, agree with the majority's conclusion that an obligation to pay an insurance subrogation claim constitutes a "debt" under the FDCPA.

The FDCPA defines a "debt" as follows:

> [A]ny obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5) (2000).

The majority opinion focuses on the words "any obligation" and "arising out of," and concludes that the FDCPA applies to an insurance subrogation claim. The reasoning in the majority opinion appears to be as follows: United Health Care of Louisiana, Inc. ("United") agreed to provide insurance for Hamilton (via an agreement with his father's employer). That insurance agreement is a "transaction" that is "primarily for personal, family, or household purposes" because it provides health care insurance for employees and their families. The agreement is a "but for" cause of United's subrogation claim, for, without the agreement, United would have no claim for reimbursement. Therefore, the majority concludes, the

14

subrogation claim "arises out of" a consumer transaction for insurance, and constitutes a "debt" for purposes of the FDCPA.

I doubt, however, that the matter is so simple. The word "debt" as defined in the FDCPA does not have the expansive scope that the majority's analysis suggests. The Seventh Circuit (whose decisions are relied on extensively by the majority opinion) has reasoned that "not all obligations to pay are considered 'debts' under the [FDCPA]." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir. 1997). On the contrary, "the definition of 'debt' . . . serves to limit the scope of the [Act]." *Id.*; *see also Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371 (11th Cir. 1998) ("[W]e do not hold that every consensual or business dealing constitutes a 'transaction' triggering application of the FDCPA (such a holding would be contrary to the plain language of the statute limiting applicability to specified transactions . . .).").[3]

In addition, only an extremely broad interpretation of "arising out of" could lead the majority to conclude that United's subrogation claim "aris[es] out of" the single transaction between United and Hamilton. The subrogation claim asserted by United arose out of a string

---

[3] The majority opinion refers to language in *Bass* suggesting that the FDCPA should be given a broad interpretation. It is important to keep in mind the context of the *Bass* court's statements. The Seventh Circuit was determining whether it should follow dicta from the Third Circuit's decision in *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3d Cir. 1987). *Zimmerman* suggested that the FDCPA applied only to obligations involving an "extension of credit," such as credit card debts or other situations in which a consumer defers payment on an item. *Id.* at 1168-69. The Seventh Circuit, in discussing the "absolute language" of the FDCPA, was determining only that the *Zimmerman* court was wrong to limit the Act to obligations involving an extension of credit. *Bass,* 111 F.3d at 1325. As the language quoted in this dissent makes clear, the *Bass* court did *not* mean that there were no limitations on the definition of "debt." *See also Duffy v. Landberg*, 133 F.3d 1120, 1123 (8th Cir. 1998) (also referring to the broad wording of the Act in order to reject the dicta in *Zimmerman*).

15

of events. First, there was the insurance contract between United and Hamilton. Second, there was the contract for uninsured and/or underinsured motorist coverage ("UM policy") between Hamilton and State Farm. Third, there was the accident that injured Hamilton. Fourth, there was United's payment of Hamilton's medical bills. Fifth, there was the payment by State Farm to Hamilton pursuant to the UM policy. So, although one might say that this subrogation claim arose out of the underlying insurance agreement between United and Hamilton, one could also say that the claim arose out of any one of these other events. It would be most accurate to say that the subrogation claim arose out of the combination of events, and not out of a single transaction.[4]

Nevertheless, the majority opinion concludes that "[t]here is no question that the obligation to pay arose out of Hamilton's transaction of purchasing insurance." The opinion supports this conclusion by asserting that this Court has given the phrase "arising out of" an expansive interpretation. It is true that we have construed the phrase broadly when interpreting *insurance policies*. *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir. 1998) ("This court has held that the words 'arising out of,' *when used within an insurance policy*, are 'broad, general, and comprehensive terms effecting broad coverage.' . . . The words are 'understood to mean "originating from," "having its origin in," "growing out of," or "flowing from."'") (quoting *Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co. of Wis.*, 189 F.2d 374, 378 (5th Cir. 1951)) (emphasis added); *Jarvis Christian Coll.*

_____

[4] The district court wisely noted the degree to which United's subrogation claim is attenuated from the underlying contract. *See Hamilton v. United Healthcare of La., Inc.*, Nos. Civ.A. 01-585, 01-650, 2001 WL 812076, at *3 (E.D. La. July 16, 2001) ("[H]ad Plaintiff not engaged in another transaction *wholly unrelated* to his contract with United, *i.e.*, obtaining his own UM policy through another insurer, no obligation would exist.") (emphasis added).

16

*v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F.3d 742, 747 n.5 (5th Cir. 1999) (same). We have not, however, consistently used this expansive interpretation of "arising out of" in the context of interpreting *federal statutes*. *See Humphries v. Various Fed. USINS Employees*, 164 F.3d 936, 942-44 (5th Cir. 1999) (noting, in a case involving a federal statute, the different interpretations given by courts to terms such as "arising from" and "arising out of"). Therefore, a broad interpretation of "arising out of" may not be appropriate in this context.

Indeed, the case law in this area provides no support for the majority opinion's expansive interpretation of "arising out of." Each case in which other appellate courts found a "debt" to exist under the FDCPA involved an obligation that arose out of a single transaction. Thus, courts have determined that an obligation to pay home owner's association dues, *Ladick v. Van Gemert*, 146 F.3d 1205, 1207 (10th Cir. 1998); *Newman v. Boehm, Pearlstein & Bright, Ltd.*, 119 F.3d 477, 482 (7th Cir. 1997), an obligation to pay for water and sewer service, *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 401 (3d Cir. 2000), an obligation to make good on a dishonored check, *Snow v. Jesse L. Riddle, P.C.*, 143 F.3d 1350, 1353 (10th Cir. 1998); *Duffy*, 133 F.3d at 1124; *Charles v. Lundgren & Assoc., P.C.*, 119 F.3d 739, 742 (9th Cir. 1997); *Bass*, 111 F.3d at 1330, and an obligation to pay back rent, *Romea v. Heiberger & Assoc.*, 163 F.3d 111, 119 (2d Cir. 1998), all constitute "debts" under the FDCPA. In each case, the obligation was a promise to pay for a particular good or service. In each case, the obligation at issue depended on a single transaction.

In cases where courts have found no "debt," the relationship between the obligation and the consumer transaction was more attenuated. For example, courts have held that the

17

obligation to pay property taxes does not constitute a debt for purposes of applying the FDCPA. *Pollice*, 225 F.3d at 401-02; *Beggs v. Rossi*, 145 F.3d 511, 512-13 (2d Cir. 1998). The obligation to pay property taxes does, in a sense, "arise out of" the purchase of a home. Indeed, under the majority's expansive interpretation of "arising out of," it would be nearly impossible to conclude otherwise. After all, the purchase of a home is a "but for" cause of the obligation to pay property taxes. In *Pollice*, however, the Third Circuit found that the obligation to pay property taxes did not arise from the purchase of property, but rather from the "*fact of ownership*." 225 F.3d at 402 (emphasis in original). The Third Circuit declined to adopt an interpretation of "arising out of" as expansive as that of the majority in this case. Indeed, no case appears to support the majority opinion's broad reading of "arising out of."[5]

---

[5] Hamilton relies on *Brown v. Budget Rent-A-Car Systems, Inc*., 119 F.3d 922 (11th Cir. 1997), for the proposition that a "debt" under the FDCPA does not have to arise out of a single transaction. In that case, Brown rented at truck and dolly from Budget. *Id.* at 923. Not long after leaving the rental agency, Brown was in an accident. *Id.* Budget demanded that he pay for the repair of the vehicle, as well as loss of use and administrative fees. *Id.* Brown's insurance company paid for the repairs, but Brown refused to pay the other charges, contending that they were covered by a Loss Damage Waiver provision in the rental agreement. *Id.* After Budget hired a collection agency, Brown sued, contending that the agency's practices violated the FDCPA. *Id.* The district court dismissed Brown's claim, finding that the FDCPA applied only to transactions involving an extension of credit. *Id.* at 923-24. The Eleventh Circuit reversed, holding that the FDCPA was not limited to such transactions. *Id.* at 925. The court did *not*, however, hold that Brown's obligation in fact constituted a "debt" under the FDCPA. *See Hawthorne*, 140 F.3d at 1371 ("Although we recently held [in *Brown*] that a 'debt' need not require the extension of credit . . . we have not previously addressed the limits of the FDCPA's definition of 'debt.'"). Therefore, *Brown* provides no support for Hamilton's contention that a "debt" can arise out of a series of events.

It is true that the Eleventh Circuit remarked in *Hawthorne* that "the facts delineated in *Brown* do not exclude the possibility that the obligation in that case constituted a 'debt' under the FDCPA." *Hawthorne*, 140 F.3d at 1373. But the court made that remark in order to distinguish *Brown* from the case before it. In *Hawthorne*, an insurance company brought a subrogation claim against a tortfeasor. *Id.* at 1369. The tortfeasor sued the debt collection agency, claiming violations of the FDCPA. *Id.* The Eleventh Circuit found that the tortfeasor's alleged obligation did not constitute to a "debt" because it did not arise out of a consensual transaction; there was never *any* agreement between the tortfeasor and the insurance company for the injured party. *Id.* at 1371. The court

18

The central problem with the majority's analysis is that it oversimplifies the issue in this case. The majority lumps the subrogation provision with the rest of the insurance agreement, without recognizing that not all obligations under the agreement are identical for purposes of the FDCPA. It seems beyond dispute that a consumer's obligation to pay the premiums on an insurance policy "arises out of" the insurance agreement, and thus constitutes a "debt" under the FDCPA. The obligation to pay premiums fits in perfectly with the line of cases cited above. The obligation clearly arises out of a single transaction (the insurance agreement) and pays for a particular service (health insurance).

Subrogation by its very nature, however, cannot fit into this neat paradigm. Subrogation never arises out of a single transaction. Subrogation is "[t]he substitution of one person in the place of another with reference to a lawful claim[.]" BLACK'S LAW DICTIONARY 1427 (6th ed. 1990). In essence, subrogation is an assignment. *See Rohner, Gehrig & Co. v. Capital City Bank*, 655 F.2d 571, 579 (5th Cir. 1981) (observing that, under the law of many states, "a subrogation agreement is equivalent to an assignment"). One person (the subrogor) assigns to another person (the subrogee) a claim that the subrogor has against a third party. In the health insurance context, this concept plays out as follows: an insurance company promises the insured that, in case of an accident, it will pay his medical bills. The insured no longer has to worry about recovering from a tortfeasor or any other source because the insurance company has agreed to cover his medical costs. The insured

---

contrasted *Brown* by noting that "Brown's obligations arose at least in part out of a business transaction where Brown contracted for what appear to be personal services (the truck rental and the loss damage waiver protection)." *Id.* at 1373. The *Hawthorne* court did not state that the obligation in *Brown* should be considered a "debt" for purposes of the FDCPA.

19

party (the subrogor) therefore assigns to the insurance company (the subrogee) his right to recover from a tortfeasor or other source. But that subrogation claim does not arise until the insured is actually in an accident, and has the right to receive money from the third party. Thus, a subrogation claim *cannot* arise out of a single transaction between two parties.[6]

Nor does a consumer, by paying a subrogation claim, receive a particular good or service. If valid, United's subrogation claim would serve two purposes, neither of which directly benefits Hamilton. First, the subrogation claim would reimburse United for paying Hamilton's medical bills. Second, the claim would prevent Hamilton, the insured victim, from receiving money from both United and State Farm and thereby being overcompensated for his injuries. *See* Greenblatt, *supra*, at 1340-41 (noting that subrogation serves to reimburse the insurance company and prevent the insured from being "unjustly enriched").[7] Thus, unlike the "debts" discussed above)) the obligations to pay homeowners' association dues, water and sewer bills, or rent)) Hamilton's alleged obligation does not pay for a particular good or service. Indeed, Hamilton does not receive any direct benefit for paying a subrogation claim.[8]

---

[6] Indeed, the relationship between an insured individual and an insurance company is not typically described as a debtor-creditor relationship. Instead, the insured party (the accident victim) is considered "the creditor" and the tortfeasor (or other party that owes the insured money) is "the debtor." *See* Jeffrey A. Greenblatt, *Insurance and Subrogation: When the Pie Isn't Big Enough, Who Eats Last?* 64 U. CHI. L. REV. 1337, 1340 (1997). The insured and the insurance company are known as the "subrogor" and "subrogee," respectively. *Id.*

[7] When an insurance company collects from the tortfeasor that caused the accident, subrogation serves a third purpose: "it places the burden of compensation on the tortfeasor and thus deters injurious behavior." Greenblatt, *supra*, at 1341. Because HRI is attempting to recover payments made by State Farm, this third factor is not at issue in the instant case.

[8] It may be that insured individuals do benefit *indirectly* from subrogation. Insurance companies may be able to reduce their costs through subrogation. They might pass these savings along to their customers in the form of lower premiums. *See* Greenblatt, *supra*, at 1354-55

On the contrary, United's subrogation claim, if valid, would prevent Hamilton from receiving

a "windfall" by collecting from both United and State Farm.[9]

This last point helps underscore why it would be inappropriate to apply the FDCPA in this case. Hamilton's obligation does not fit our traditional conception of "debt." United

is not demanding money from a poor consumer who has recently been down on his luck.

United has already paid Hamilton's medical bills. Now State Farm has given Hamilton money

to pay for essentially the same expenses. United's subrogation claim, if valid, would simply

prevent Hamilton from being paid twice. The FDCPA was not designed to cover this case.

The Act was drafted to protect consumers who were having difficulty paying their debts. It

was not intended to protect an accident victim, who attempts to get a "windfall" by receiving

money from multiple sources.

There is no support in either text or precedent for the majority's conclusion that an

_____

(suggesting that insurance companies can take subrogation into account in setting their rates, and set lower rates for customers that agree to subrogation); Steven P. Croley & Jon D. Hanson, *The Nonpecuniary Costs of Accidents: Pain-and-Suffering Damages in Tort Law*, 108 HARV. L. REV. 1785, 1870 n.292 (1995) (similarly opining that insurance companies might lower rates *ex ante* if they are likely to recover their costs through successful subrogation claims). In paying a subrogation claim, however, an insured party who has been injured in an accident is not paying for this particular benefit.

Prior to the accident, the insured party might have benefitted when *other* accident victims paid subrogation claims. That would be the case *if* the insurance company passed off its savings (the reduction in costs resulting from subrogation) onto its consumers in the form of lower premiums. After the accident, however, the accident victim himself does not receive any direct benefit by paying the subrogation claim.

[9] Scholars have noted that subrogation serves an important function: by preventing an insured party from being overcompensated for injuries suffered in an accident, it helps reduce the problem of "moral hazard") ) the possibility that an insured party might deliberately put himself at risk in order to obtain a "windfall." Alan O. Sykes, *Subrogation and Insolvency*, 30 J. LEGAL STUD. 383, 384 (2001) (observing that the "public policy against such 'windfalls' is an oft-stated rationale for subrogation").

21

obligation to pay an insurance subrogation claim constitutes a "debt" for purposes of applying

the FDCPA.  I, therefore, respectfully dissent.