REAVLEY, Circuit Judge:
Transocean Deepwater Drilling, Inc. appeals from the district court’s order enforcing administrative subpoenas issued by the Chemical Safety and Hazard Investigation Board in connection with an investigation following the disaster on the Deep-water Horizon drilling unit in the Gulf of Mexico. Transocean contends that the subpoenas should have been quashed because the Board lacks authority to investigate the incident. We AFFIRM the district court’s judgment.
*488 I.
On April 20, 2010, a blowout, explosion, and fire occurred during drilling operations at the Macondo lease site in the Gulf of Mexico. The Macondo well was being drilled by the Deepwater Horizon, a mobile offshore drilling unit (“MODU”) tasked to the job by Transocean. As a result of the incident, eleven people were tragically killed, a large volume of flammable gas, oil, and other hazardous substances were released into the water and ambient air, and substantial property damage occurred.
Numerous governmental agencies responded to the disaster, including the Chemical Safety and Hazard Investigation Board (“CSB” or “the Board”). Established by the Clean Air Act Amendments of 1990 and modeled after the National Transportation Safety Board (“NTSB”), the CSB serves a public safety mission by investigating accidental releases of hazardous substances into the ambient air and by reporting to the public its findings and recommendations for preventing and minimizing the risk of industrial chemical accidents.
As part of its investigation into the incident at the Macondo well, the CSB issued five administrative subpoenas to Trans-ocean. The subpoenas sought answers to interrogatories and the production of relevant records, including documents generated by Transocean’s own internal investigation. Transocean took the position that the CSB lacked authority to investigate the incident, and it therefore failed to comply fully with the CSB’s subpoenas.
The United States filed a petition on behalf of the CSB to enforce the administrative subpoenas, while Transocean moved to quash them and to dismiss the petition. Transocean argued that the CSB was not authorized to conduct an investigation because, inter alia, the incident was a marine oil spill over which the CSB lacks jurisdiction, and the incident did not occur on a stationary source.
The district court denied Transocean’s motion and ordered enforcement of the subpoenas. The district court held that the CSB was investigating only the release of airborne gases from the blowout and explosion and was not investigating the subsequent oil spill from the well. The court further determined that the CSB would lack authority to investigate an incident involving a marine oil spill only if the NTSB was authorized to investigate. The court held that the NTSB was not authorized to investigate this incident, however, because the incident was located fifty miles off the coast of the United States on the Outer Continental Shelf and did not involve a “vessel of the United States,” and because the incident was not transportation related. The court also concluded that the Deepwater Horizon and its subsea riser comprised a drilling installation that satisfied the statutory requirement of a “stationary source” from which the accidental release of gases the CSB was authorized to investigate. The district court therefore held that the CSB had authority to investigate the incident and to issue the administrative subpoenas. Transocean now appeals.
II.
Administrative subpoenas issued in aid of an investigation will generally be enforced judicially if “(1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome.” See Burlington N. R. Co. v. Office of Inspector Gen., R.R. Ret. Bd., 983 F.2d 631, 638 (5th Cir.1993); see also United States v. Powell, 379 U.S. 48, 57- *489 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964) (holding that enforcement of administrative subpoenas requires a showing “that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the [agency’s] possession, and that the administrative steps required by [statute] have been followed”). The Government bears the initial burden to show that these criteria have been met, although the burden to make a prima facie case is “minimal.” United States v. Tex. Heart Inst., 755 F.2d 469, 474 (5th Cir.1985), overruled on other grounds by United States v. Barrett, 837 F.2d 1341 (5th Cir.1988) (en banc). Once the Government has made a prima facie case, the burden of going forward shifts to the party opposing the subpoenas. Id.
In this case, Transocean focuses its arguments on appeal on the authority of the CSB to issue the subpoenas. We review the district court’s factual findings underlying its decision on this issue for clear error and its conclusions of law de novo. Burlington, 983 F.2d at 638, 641.
III.
Transocean contends that the CSB had no authority to issue the administrative subpoenas because the CSB lacked jurisdiction to investigate the incident at the Macondo well. An administrative agency’s authority is necessarily derived from the statute it administers and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125, 120 S.Ct. 1291, 1297, 146 L.Ed.2d 121 (2000); see also Texas v. United States, 497 F.3d 491, 500-01 (5th Cir.2007). Here, as noted above, the CSB is an independent federal investigative agency established by the Clean Air Act Amendments of 1990. See Pub.L. No. 101-549, Title III, sec. 301, 104 Stat. 2399 (Nov. 15, 1990). The Board is authorized to “investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages.” 42 U.S.C. § 7412(r)(6)(C)(i). An “accidental release” is “an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.” § 7412(r)(2)(A). A “stationary source” is defined as “any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.” § 7412(r)(2)(C).
A.
Transocean argues first that the CSB lacked jurisdiction to investigate the incident at the Macondo well because the Deepwater Horizon is not a “stationary source” as that term is contemplated by the statute. Transocean reasons that because the word “stationary” in the term “stationary source” is not defined, the word must be construed as commonly understood, which Transocean contends means a fixed and unchanging object rather than something that is moveable. Transocean argues that the Deepwater Horizon was not only moveable but also was a “vessel in navigation.” It reasons, therefore, that the drilling unit could not be a stationary source. We disagree with Transocean’s reasoning.
*490 Transocean is correct that similar mobile offshore drilling units and other structures, and even the Deepwater Horizon itself, have been held to be vessels under maritime law. See, e.g., Demette v. Falcon Drilling Co., 280 F.3d 492, 498-99 (5th Cir.2002), overruled in part on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC, 589 F.3d 778 (5th Cir.2009) (en banc). For example, in Dem-ette, we noted that “special-purpose moveable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law.” Demette, 280 F.3d at 498 n. 18. It is also well-established that “special-purpose structures” may remain vessels under the Jones Act while engaged in drilling operations. See, e.g., Offshore Co. v. Robison, 266 F.2d 769, 776 (5th Cir.1959). And under Supreme Court precedent a “watercraft practically capable of maritime transportation” is considered to be a “vessel” under the Longshore and Harbor Workers’ Compensation Act regardless of its purpose or state of transit at a particular moment. Stewart v. Dutra Constr. Co., 543 U.S. 481, 497, 125 S.Ct. 1118, 1129, 160 L.Ed.2d 932 (2005). Indeed, the Supreme Court held that a watercraft does not “pass in and out of Jones Act coverage depending on whether it was moving at the time of the accident.” Id. at 495-96, 125 S.Ct. at 1128. Based on the foregoing authority, the district court in the multi-district litigation spawned from the Macon-do well incident held that the Deepwater Horizon was a vessel under general maritime law. See In re Oil Spill by the Oil Rig “DEEPWATER HORIZON” in the Gulf of Mexico, on April 20, 2010, 808 F.Supp.2d 943, 950 (E.D.La.2011); see also In re Deepwater Horizon, 745 F.3d 157, 164 (5th Cir.2014) (noting the vessel status of the drilling unit).
Nevertheless, in this case we are not dealing with the application of, or definitions under, the Jones Act and general maritime law. The fact that the Deepwa-ter Horizon may be a vessel for purposes of maritime law does not answer the question whether it meets the specific statutory definition of a “stationary source” under the Clean Air Act.
The phrase “stationary source” is expressly defined by the Clean Air Act. When Congress provides a specific definition of a term, we must accept that meaning and limit our analysis to the prescribed definition. See Stenberg v. Carhart, 530 U.S. 914, 942, 120 S.Ct. 2597, 2615, 147 L.Ed.2d 743 (2000) (“When a statute includes an explicit definition, we must follow that definition, even if it varies from that term’s ordinary meaning.”); cf. Hamilton v. United Healthcare of La., Inc., 310 F.3d 385, 391 (5th Cir.2002) (“A fundamental canon of statutory construction instructs that in the absence of a statutory definition, we give terms their ordinary meaning.” (emphasis added)); see also United States v. Crittenden, 372 F.3d 706, 711 (5th Cir.2004) (Dennis, J., concurring in part and dissenting in part) (“[W]hen context dictates that a term has a particular definition, that definition will apply instead of the plain meaning of the term.”). We therefore must apply the definition of “stationary source” provided within § 7412(r)(2)(C).
We find nothing within the definition of “stationary source” found in § 7412(r)(2)(C) that precludes a vessel from satisfying the statutory requirements for a stationary source. Indeed, counsel for Transocean conceded during oral argument that a vessel could be stationary, but he argued that the drilling unit here was in constant motion over the well because of the unit’s stabilizing thrusters. The amicus makes the same argument, contending that under Coast Guard regulations the *491 Deepwater Horizon was a vessel considered to be underway.
Of course, the whole point of the stabilizing thrusters is to keep the drilling unit largely stationary over the well so that it can perform its drilling operation, a “stationary activity.” See § 7412r(2)(c). Regardless whether the unit is considered to be underway, the Deepwater Horizon was “dynamically-positioned” and “employed a satellite global positioning device and complex thruster technology to stabilize itself.” In re Oil Spill by the Oil Rig “DEEPWA-TER HORIZON” in the Gulf of Mexico, on April 20, 2010, 808 F.Supp.2d 943, 950 (E.D.La.2011) (emphasis added). Its eight directional thrusters were used to keep the rig in place over the wellhead during drilling. National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Macondo: The Gulf Oil Disaster, Chief Counsel’s Report 29 (2011), available at http://www.eoearth.org/files/164401_ 164500/164423/full.pdf (hereinafter “Chief Counsel’s Report”).
It is true that the Deepwater Horizon was capable of propulsion. However, this propulsion ability is an advancement in drilling technology that has allowed these units to arrive and remain at different drilling locations, making it easier for the oil and gas industry to drill for oil in deeper water. See Chief Counsel’s report at 12. This is because “[i]n water depths greater than about 1,000 feet, it is increasingly impractical to conduct production operations from structures that are supported by the ocean floor, and floating facilities and subsea production systems dominate.” Id. at 7. This economic advantage to the oil and gas industry does not mean, however, that the activity of the mobile drilling units cannot come under the CSB’s jurisdiction as a stationary source if other statutory conditions are met, even though the drilling unit is also a vessel. “Once moved onto location, a [dynamically positioned] rig holds itself in place above a drilling location using satellite positioning technology and directional thrusters.” Id. at 12-13; see also id. at 26 (“Dynamically positioned MODUs utilize dynamic satellite positioning technology connected to powerful directional thrusters to maintain themselves in place over a subsea wellhead.”). In this case, the Deep-water Horizon was deployed to the Macon-do well site in February 2010 and had remained in place at the site for approximately two months.[1] See id.
*492 The Government urges, and the district court essentially found, that the Macondo drilling installation as a whole was a stationary source. We agree. At the time of the blowout and explosion the drilling operations occurred at a fixed, specific point in the Gulf of Mexico—the Macondo lease site—and the Deepwater Horizon was physically connected (though not anchored) at that site and maintained a fixed position. The drilling installation as a whole included the drilling unit, along with its casing, wellhead, riser, and related apparatus. The blowout preventer alone was more than five stories tall and weighed more than 300 tons sitting atop the wellhead on the ocean floor. Chief Counsel’s Report at 29-30. The Deepivater Horizon was then connected to the wellhead by 5000 feet of drill pipe. See In re Oil Spill by the Oil Rig “DEEPWATER HORIZON” 808 F.Supp.2d at 950. As noted above, a stationary source includes “any buildings, structures, equipment, installations or substance emitting stationary activities.” § 7412(r)(2)(C) (emphasis added). The drilling installation here satisfied this definition.[2]
Transocean raises a question in its reply brief about the terms of the stationary source definition, namely that the source “belong to the same industrial group,” be “located on one or more contiguous properties,” be “under the control of the same person,” and be something “from which an accidental release may occur.” § 7412(r)(2)(C). Transocean has never, in the district court, or its initial brief, raised this argument. Because we do not consider arguments raised for the first time in a reply brief, we decline to address this issue. See DePree v. Saunders, 588 F.3d 282, 290 (5th Cir.2009).
B.
Transocean next argues that the CSB lacked jurisdiction to investigate the Ma-condo well incident because Congress specifically denied the CSB authority over this type of incident. Its argument is essentially two-fold: first, it contends that the Macondo well incident was a marine oil spill, and the Clean Air Act specifically precludes the CSB from investigating all marine oil spills; second, it contends that even if the statute does not preclude the CSB from investigating all marine oil spills, the CSB could not investigate this incident because the NTSB had jurisdiction to investigate.
Transocean’s argument is based on the following provision of the Clean Air Act:
The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of *493 releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.
§ 7412(r)(6)(E) (emphasis added).
Transocean argues that the above italicized language shows that the CSB is not authorized to investigate marine oil spills and that, instead, the NTSB is authorized to investigate all of those incidents.[3]
The district court held that the marine oil spill exclusion did not apply to the CSB’s investigation of the Maeondo well incident because the CSB was not investigating the marine oil spill associated with the disaster but rather was investigating the release of gases and the explosion that preceded the release of oil. We agree with the district court’s conclusion.[4]
Although Transocean argues that the primary environmental disaster resulting from the Maeondo well incident was the massive oil spill, it also concedes in its brief that the blowout, explosion, and fire, followed by the collapse of the Deepwater Horizon, involved the release of airborne gases. That release was the triggering of the CSB’s authority to investigate. See § 7412(r)(2)(A) (authorizing CSB investigations of accidental releases, which are defined as “unanticipated emissions[s] ... into the ambient air”). Transocean argues, however, that because the CSB’s jurisdiction always depends on a release of gases, the marine oil spill exclusion (1) necessarily contemplates an accidental release that would otherwise be within the CSB’s jurisdiction but is merely incidental to a marine event, and (2) expressly excludes that event from CSB’s investigatory authority. A contrary conclusion, Trans-ocean argues, would render the marine oil spill exclusion surplusage. Transocean’s argument assumes, however, that the CSB may not investigate any release of gases associated with a marine oil spill. As we explain, we disagree.
Transocean’s argument is textual, and it is primarily based on the statutory provision noted above that the CSB “shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate.” See § 7412(r)(6)(E). According to Trans-ocean’s reading of that sentence, the stat *494 ute precludes the CSB from investigating all marine oil spills insofar as the NTSB has jurisdiction over those occurrences.
We agree with the district court, however, that the CSB is not precluded from investigating all marine oil spills, but rather only those “spills, which” the NTSB may investigate. In other words, the CSB may be precluded from investigating those marine-related incidents that the NTSB is authorized to investigate. This interpretation of the statute reads “which” to mean “that,” and it comports with the statutory scheme as a whole.
Transocean contends, however, that based on the rules of grammar and punctuation the word “which” preceded by a comma creates a nonrestrietive, descriptive clause so that the declarative portion of the sentence in § 7412(r)(6)(E)—pre-cluding investigation of marine oil spills— is controlling. See, e.g., William Strunk, Jr. & E.B. White, The Elements of Style 3^4 (3d ed.1979) (hereinafter “Strunk & White”) (explaining that nonrestrietive clauses introduced by “which” add nonessential parenthetic information and are set off by commas). If we were reading the sentence in isolation we might agree. But while the rules of grammar are not irrelevant, we should not “be guided by a single sentence or member of a sentence;” rather, we must “look to the provisions of the whole law, and to its object and policy.” U.S. Nat’l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) (internal quotation marks and citation omitted); cf. Flora v. United States, 362 U.S. 145, 149, 80 S.Ct. 630, 633, 4 L.Ed.2d 623 (1960) (noting that a court “does not review congressional enactments as a panel of grammarians”).
We note first that reading the comma-which clause to mean “that” is consistent with subsection (E) as a whole and the subsection’s other uses of the word “which.” In addition to the comma-which, the statute twice uses the word “which” in the previous sentence, reading thusly: “The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related.” § 7412(r)(6)(E) (emphasis added). The first “which” in this sentence refers to the “memorandum of understanding” while the second “which” refers to “releases.” It is clear that each “which” in this sentence should be read as “that” because the clauses are restrictive, i.e. they give essential meaning about the preceding nouns (the “memorandum of understanding” and the “releases”). Although Congress is presumed to know the rules of grammar, see United States v. Goldenberg, 168 U.S. 95, 102-03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897), this grammatical oversight is understandable, as “[ujsing which for that is perhaps the most common blunder with these words.” Bryan A. Garner, Gamer’s Dictionary of Legal Usage 889 (3d ed.2011); see also Strunk & White at 59 (“The use of which for that is common in written and spoken language.”).
If we read the first two uses of “which” in subsection (E) to mean “that,” it would be natural to construe the eommawhich to also mean “that.” See Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 2417, 168 L.Ed.2d 112 (2007) (“[I]dentical words and phrases within the same statute should normally be given the same meaning.”); see also U.S. Nat’l Bank of Oregon, 508 U.S. at 460, 113 S.Ct. at 2185. Of course, the difference between the first two uses of the word “which” in subsection (E) and *495 the comma-which clause is the presence of the comma, and in isolation the comma could be significant. But “a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute’s true meaning.” Id. at 454, 113 S.Ct. at 2182; see Costanzo v. Tillinghast, 287 U.S. 341, 344, 53 S.Ct. 152, 153, 77 L.Ed. 350 (1932) (“It has often been said that punctuation is not decisive of the construction of a statute.”). Construing the words in context, as we must, we strive to “interpret the statute ‘as a symmetrical and coherent regulatory scheme.’ ” Brown & Williamson Tobacco Corp., 529 U.S. at 133, 120 S.Ct. at 1301 (citation omitted). Here, we must consider the “comma-which” clause along with the entire provision as part of “ ‘a holistic endeavor.’ ” U.S. Nat’l Bank of Oregon, 508 U.S. at 455, 113 S.Ct. at 2182 (citation omitted). We will “ ‘disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute.’ ” Id. at 462, 113 S.Ct. at 2186 (citation omitted).
Subsection (E) contemplates that the CSB is not the only government agency charged with a public safety mission and may not be the only investigating agency; indeed, it expressly directs the CSB to “coordinate its activities with investigations and studies by other agencies” with responsibility to protect public health and safety. § 7412(r)(6)(E). Even more specifically, the statute directs the CSB to “enter into a memorandum of understanding” with the NTSB in order to coordinate activities, limit duplication of efforts, and designate the NTSB as the lead agency if an accidental release is transportation related. Id. We agree with the district court that this provision must mean there is a category of marine oil spills that are non-transportation related and over which the NTSB lacks exclusive authority. If the comma -which clause of the marine oil spill exclusion simply precluded the CSB from investigating all marine oil spill incidents there would be no need for the requirement that CSB coordinate with the NTSB or other government agencies to avoid duplication of efforts. In context, the structure of the statute, including the prior uses of the word “which,” indicates an intent that the comma-'which clause was not meant to be non-restrictive.
Moreover, the statute expressly directs the CSB to investigate any time an accidental release causes a fatality or serious injury to the general public. See id. (“In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.” (emphasis added)). This must mean that for especially serious incidents involving either grave injury or the risk of injury, including marine oil spills, the CSB could have concurrent investigative authority with other agencies.[5] And again, the CSB would be required to coordinate its efforts with any other agencies. This provision adds further support to the conclusion that the marine oil spill exclusion is not the all-encompassing prohibition that Transocean urges.
*496 We believe that looking at the full text of the statute, rather than one isolated clause, along with the statute’s structure and its public safety purpose shows that the comma-wMc/i clause was not intended to preclude the CSB from investigating all incidents involving marine oil spills. See U.S. Nat’l Bank of Oregon, 508 U.S. at 455, 113 S.Ct. at 2182 (eschewing isolated words or sentences in favor of “a statute’s full text, language as well as punctuation, structure, and subject matter”). This reading of the statute best comports with the overall regulatory scheme. See Brown & Williamson Tobacco Corp., 529 U.S. at 133, 120 S.Ct. at 1301; see also U.S. Nat’l Bank of Oregon, 508 U.S. at 461 n. 10, 113 S.Ct. at 2186 n. 10 (searching for “the best reading of the Act, despite the punctuation marks”). We conclude, therefore, that the statute did not categorically preclude the CSB from investigating all incidents that happen to include a marine oil spill.
Transocean contends that even if the CSB could otherwise investigate the incident at the Macondo well, it was precluded from doing so in this case because the NTSB was authorized to investigate. Transocean relies solely on 49 U.S.C. § 1131(a)(1)(F), which grants the NTSB authority to investigate, inter alia, “catastrophic” accidents that are “related to the transportation of individuals or property.” It asserts that the Macondo well incident was catastrophic and that the disaster was related to transportation because the Deepwater Horizon was a vessel in navigation.
However, when the blowout occurred on April 20, 2010, the Deepwater Horizon was dynamically positioned and physically attached to the seabed, having been on site and engaged in drilling operations for a number of months. The district court held that this fact was crucial to the determination that the incident was not transportation related. Transocean cites no contrary authority. Merely because a disaster involves a vessel does not mean that the disaster was necessarily related to transportation. Although the drilling unit may have been capable of transportation, it was not involved in transporting either individuals or property at the time of the blowout, explosion, and fire. See § 1131(a)(1)(F). In other words, although the Deepwater Horizon possessed characteristics associated with transportation, those characteristics played no role in the disaster, and the accident was not related to transportation. We agree with the district court that § 1131(a)(1)(F) is inapplicable and that the NTSB lacked jurisdiction to investigate the incident under that provision, meaning that the CSB was authorized to act.
IV.
For the reasons stated above, we conclude that the CSB had jurisdiction to investigate the incident at the Macondo well and to issue the administrative subpoenas. The district court’s judgment ordering enforcement of the subpoenas is therefore AFFIRMED.

. The amicus urges that the Deepwater Horizon could not be a stationary source because under Coast Guard regulations it is considered to be a vessel "underway” and not "on location.” It posits that if a vessel is not "on location” it cannot also be a "stationary source.” In support of this argument the amicus relies on a Coast Guard investigation report of the Deepwater Horizon incident that discussed the status of the drilling unit. See U.S. Coast Guard, Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking, and Loss of Eleven Crew Members Aboard the MOBILE OFFSHORE DRILLING UNIT DEEPWATER HORIZON in the Gulf of Mexico April 20-22, 2010, at 1-10, available at https://www.hsdl.org/?view&did= 6700 (hereinafter "Coast Guard Report”). The terms “on location” and “underway” have specific statutory definitions, however, that do not affect whether the vessel may be a “stationary source” for purposes of the Clean Air Act. For example, "on location” means merely that the drilling unit is anchored. See 46 C.F.R. § 10.107 ("On location means that a mobile offshore drilling unit is bottom bearing or moored with anchors placed in the drilling configuration.”). Because the Deep-water Horizon was a dynamically positioned, anchor-less MODU, it could not satisfy the regulatory definition of “on location” and was therefore considered to be "underway.” See Coast Guard Report at 1-5. The Coast Guard Report notes that whether a vessel is "on location” or "underway” determines the navigation rules that the vessel must follow, such as for minimum manning and operational requirements. See id. at 1-5. That status alone does not indicate whether the vessel is a “sta *492 tionary source” because a vessel may be “underway” but not “making way.” Id. at 1-5-6. The Coast Guard Report specifically recognizes that even though a vessel does not meet the statutory definition for being "on location,” it may nevertheless be “essentially maintaining a fixed position” through the use of its dynamic positioning system. Id. at 1-6. That was the case with the Deepivater Horizon.

. Again, that the drilling unit itself was capable of propulsion and could and did use its thrusters to counter-act wave activity in order to remain in place over the well does not negate the fact that the drilling operation of the Deepivater Horizon was, at the very least, a "stationary activity.” See § 7412(r)(2)(C).

. Transocean refers to the emphasized language as the "marine oil spill exclusion.” For ease of reference we use the same terminology. We also refer to the clause beginning with the word "which” as the "comma-which " clause.

. The Coast Guard Report found as follows: As the well control incident unfolded, an uncontrolled volume of gas flowed up from the wellhead to the MODU and onto the Drill Floor and Main Deck. Gas samples collected by Woods Hole Oceanographic Institute on July 27, 2010 show that the composition of the uncontrolled gas discharged from the well was primarily methane (69.9%), with lesser amounts of ethane (6.9%) and propane (4.5%). The remainder of the gas consisted of a mixture of various weight hydrocarbons. Several minutes after the start of the release of gas from the wellhead, a gas cloud within the flammable range formed over large areas on several decks. The explosions likely occurred when gas from this cloud encountered one or more ignition sources on the Drill Floor or elsewhere on the MODU. Coast Guard Report, 5-6.

. Transocean argues that this provision of subsection (E) is inapplicable here because the Macondo well incident was incapable of causing death or injury to members of the general public insofar as the disaster occurred fifty miles off the coast of the United States. First, this argument is inapposite to whether the CSB is precluded from investigating all marine oil spills in the first place. Second, the offshore location of the disaster does not preclude the potential for injury to persons on shore since it cannot be denied that airborne hazardous substances could migrate and cause injury on land.