# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 17, 2020

Lyle W. Cayce
Clerk

No. 19-30558

IRIS CALOGERO, on her own behalf and on behalf of all others similarly situated,

      Plaintiff - Appellant

v.

SHOWS, CALI & WALSH, L.L.P., a Louisiana Limited Liability Partnership; MARY CATHERINE CALI; JOHN C. WALSH,

      Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before WIENER, GRAVES, and WILLETT, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Appellant-Plaintiff Iris Calogero appeals from the dismissal of her Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., claim against Shows, Cali & Walsh, L.L.P. and its partners Mary Catherine Cali and John C. Walsh (collectively "SCW"). For the following reasons, we REVERSE and REMAND.

## I. BACKGROUND

In the aftermath of Hurricanes Katrina and Rita's devastation to displaced homeowners whose primary residences were either destroyed or severely damaged, Congress appropriated billions of dollars through the

No. 19-30558

Community Development Block Grant program ("CDBG") of the Department of Housing and Urban Development ("HUD"). In 2006, Louisiana applied for CDBG funds for the Road Home Program ("Road Home") to provide grants for home repair and rebuilding, support affordable rental housing, and offer housing support services. Upon HUD's approval of the largest single housing recovery program in the United States, the Louisiana Office of Community Development ("OCD") and Louisiana Recovery Authority ("LRA") were tasked with implementing Road Home.

Calogero resides in Slidell, Louisiana, and her home was significantly damaged by Hurricanes Katrina and Rita. Calogero applied for a Road Home grant used as "compensation for damages suffered [by homeowners] from the Hurricanes." Once approved as a Road Home recipient, Calogero entered into an agreement[1] with the OCD and received $33,392.68 disbursed in one lump sum. The agreement consisted of four parts—the Road Home Declaration of Covenants Running with the Land; the Road Home Program Grant Agreement; the Road Home Limited Subrogation/Assignment Agreement; and the Road Home Grant Recipient Affidavit. As part of the Declaration of Covenants, Calogero agreed to several terms, including limitations on the transfer and sale of her property, occupancy of the Slidell property as her primary residence for three years after the execution of the agreement, maintenance of casualty and flood insurance, documentation demonstrating compliance with the agreement, and a waiver disclaiming Louisiana, the

---

[1] Calogero attached three exhibits to her complaint—four documents that memorialized Calogero's acceptance of Road Home grant money and program conditions; SCW's letter dated February 9, 2018 seeking repayment of excess funds awarded; and SCW's letter dated April 10, 2018 providing verification of repayment owed. "In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)).

## No. 19-30558

United States, or any other government branch or agency's liability for actions relating to the grant. Under the Limited Subrogation/Assignment Agreement and "in consideration for [her] receipt of funds under Road Home program," Calogero assigned to the State any recovery of funds she received from insurance or the Federal Emergency Management Agency ("FEMA"). Calogero also agreed to promptly pay the State any insurance or assistance payments that would have reduced the Road Home grant amount if Calogero received such payments prior to the receipt of the Road Home grant.

Over a decade after Calogero received the Road Home grant, Appellee SCW sent a letter to Calogero seeking $4,598.89 as repayment for an alleged grant overpayment per the Road Home Program Agreement. SCW identified itself as a "debt collector" representing Louisiana and Road Home in connection with the hurricane relief grant Calogero received. After Calogero disputed the overpayment, SCW sent another letter providing a breakdown of the amount, including $5,300 owed in duplicated FEMA benefits, $1,269.85 owed in overpaid homeowner insurance proceeds, and a $1,970.96 credit due to a recalculated insurance penalty.[2] Calogero then initiated this federal suit against SCW in the Eastern District of Louisiana. Calogero alleged on behalf of herself and a proposed class that SCW violated the FDCPA for its purported use of misrepresentation, false or deceptive means, and unfair or unconscionable means to collect a debt that cannot be legally taken. *See* 15

---

[2] Specifically, the letter explained that Calogero initially reported $5,200 in FEMA benefits but the Office of Community Development Disaster Recovery Unit later verified that she received $10,500 in FEMA benefits for Replacement Housing and Real Property. The letter also explained that Calogero initially reported $14,733.29 in Homeowner's Insurance Benefits but her homeowner's insurance carrier confirmed that the total amount was $16,003.14 resulting in a variance of $1,269.85. Because Calogero lacked flood insurance coverage on the damaged property at the time of the grant closing, her initial penalty of 30% was recalculated based on amount she should have received and resulted in a credit of $1,970.96.

No. 19-30558

U.S.C. §§ 1692e(2)(A), 1692e(5), 1692e(10), 1692f. Calogero also brought claims individually against SCW for using deceptive means or unfair or unconscionable means to collect or attempt to collect $4,598.89 in violation of the FDCPA. *See* 15 U.S.C. §§ 1692e(10), 1692f.

SCW subsequently filed a Rule 12(b)(6) motion to dismiss for failure to state a claim, contending that the FDCPA is inapplicable to Calogero's claims because the Road Home money was a form of disaster compensation and Calogero failed to establish that the money being collected qualified as "debt" under 15 U.S.C. § 1692a(5). The district court granted SCW's motion and dismissed Calogero's FDCPA claims with prejudice after concluding that the money owed under the Road Home Program was not a "debt" within the meaning of the FDCPA. Calogero timely appealed.

## II. STANDARD OF REVIEW

We review a district court's order granting a motion to dismiss for failure to state a claim de novo. *Leal v. McHugh,* 731 F.3d 405, 410 (5th Cir. 2013). We view the well-pleaded facts in the light most favorable to the nonmoving party. *Turbomeca, S.A. v. Era Helicopters, LLC,* 536 F.3d 351, 354 (5th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).

## III. DISCUSSION

The FDCPA was enacted in part "to eliminate abusive debt collection practices by collectors." 15 U.S.C. § 1692(e). Prohibited practices include conduct designed to "harass, oppress, or abuse any person in connection with

4

the collection of a debt," 15 U.S.C. § 1692d, and the use of "false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e.

"To state an FDCPA claim, Plaintiffs must first allege that they have been the object of collection activity arising from 'debt.'" *Hall v. Phenix Investigations, Inc.*, 642 F. App'x 402, 405 (5th Cir. 2016) (citing *Douglas v. Select Portfolio Servicing, Inc.*, No. 4:14-1329, 2015 WL 1064623, at *4 (S.D. Tex. Mar. 11, 2015) (setting forth the elements of a FDCPA claim)). The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). In simpler terms, FDCPA debts are "payment obligations of (1) a consumer arising out of (2) a transaction in which the money, property, insurance or services at issue are (3) primarily for personal, family or household purposes." *Agrelo v. Affinity Mgmt. Servs., LLC,* 841 F.3d 944, 950 (11th Cir. 2016) (quoting *Oppenheim v. I.C. Sys., Inc.*, 627 F.3d 833, 837 (11th Cir. 2010)). The parties do not dispute that Calogero is a consumer[3] or that Road Home provided disaster relief money for personal, family, or household purposes. The crux of the appeal is whether Calogero's obligation to repay grant money "aris[es] out of a transaction" for purposes of a "debt" under the FDCPA. 15 U.S.C. § 1692a(5).

To assist in making this determination, the Third Circuit has helpfully "distill[ed] a three-part test to evaluate whether an obligation constitutes 'debt' under the FDCPA." *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898

---

[3] A "consumer" is statutorily defined as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3).

F.3d 351, 360 (3d Cir. 2018). First, we determine if the "underlying obligation arises out of a transaction" meaning the "consensual exchange involv[es] an affirmative request and the rendition of a service or purchase of property or other item of value, such as a contract." *Id.* (internal citations and quotations omitted). Second, if we affirmatively answer the first question, we "next identify what money, property, insurance, or services . . . are the subject of the transaction, i.e., what it is that is being rendered in exchange for the monetary payment." *Id.* at 361 (internal citation and quotation omitted). Third, "we consider the characteristics of that 'money, property, insurance, or services' to ascertain whether they are 'primarily for personal, family, or household purposes.'" *Id.* (quoting 15 U.S.C. § 1692a(5)). Under the Third Circuit's test, a plaintiff must satisfy all three prongs of the *St. Pierre* test for the obligation of repayment to constitute an FDCPA debt.

### A. Whether the obligation to repay Road Home money arises out of a "transaction"?

#### *i. Statutory Interpretation of "Transaction"*

"When interpreting a statute, we look first and foremost to its text." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 356 (1994). The term "transaction" is not defined in the FDCPA or in any other relevant statutory provision. *See Barlow v. Safety Nat. Cas. Corp.,* 856 F. Supp. 2d 828, 834 (M.D. La. 2012) (acknowledging that FDCPA cases can create close calls when the "facts hardly constitute the quintessential consumer debt").

Accordingly, we apply the "fundamental canon of statutory construction" which instructs that "words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute." *New Prime Inc. v. Oliveira,* 139 S. Ct. 532, 535 (2019) (internal quotations and citations omitted). We are prohibited from "freely invest[ing] old statutory terms with *new meanings*" as it risks courts "amending legislation outside the 'single,

finely wrought and exhaustively considered, procedure' the Constitution commands." *Id.* at 532 (emphasis added) (quoting *I.N.S. v. Chadha,* 462 U.S. 919, 951 (1983)).

When Congress passed the FDCPA in 1978, many dictionaries defined "transaction" as an agreement, negotiation, or business dealing. *See, e.g., Oxford English Dictionary* 251 (1933) (defining "transaction" as "the adjustment of dispute between parties by mutual concession, compromise; hence *gen,* an arrangement, an agreement, a covenant"); *American College Dictionary* 1285 (1970) (defining "transaction" as "an act of transacting" and defining "transact" as "to carry through (affairs, business, etc.) to a conclusion or settlement" or "to carry through affairs or negotiations"); *Random House's College Dictionary* 1394 (1973) (defining transaction as "an act of transacting" and defining "transact" as "to carry on or conduct (business, negotiations, activities, etc.) to a conclusion of a settlement"); *Webster's Third New International Dictionary of the English Language* 2425-26 (1976) (defining "transaction" as "an adjustment or compromise in Roman or civil law of a disputed claim effected by mutual agreement and resembling the accord and satisfaction of the common law" or "a communicative action or activity involving two parties or two things reciprocally affecting or influencing each other"); *Webster's New Collegiate Dictionary* 1239 (1977) (indicating that the most common meaning[4] of the term "transaction" is "a business deal" but that meaning is subsumed within the more general definition "an act, process, or instance of transacting"). Black's Law Dictionary defined "transaction" as "act of transacting or conducting any business; negotiation, management; proceeding that which is done" and said that the term "may involve selling,

---

[4] "[E]sp" is "used to introduce the most common meaning included in the more general preceding definition." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) (quoting 12,000 Words: A Supplement to Webster's Third 15a (1986)).

leasing, borrowing, mortgaging, or lending." *Black's Law Dictionary* 1341 (5th ed. 1979). It further noted that the word "is a broader term than 'contract'" and "must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered." *Id.*

We have also determined that the "ordinary meaning of the term 'transaction' is a broad reference to many different types of business dealings between parties, and does not connote any specific form of payment." *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) (citing one definition of "transaction" from a 1986 version of Webster's New World Dictionary but interchangeably using the word "contract"); *see also Oppenheim*, 627 F.3d at 837 (recognizing "the broad scope of 'debt' in the FDCPA" as long as the "transaction creates an obligation to pay" (internal citation omitted)). The consensus among circuit courts also strengthens our view that the term "transactions" refers to business dealings best characterized as "a consensual exchange involving an affirmative request" and "the rendition of a service or purchase of property or other item of value." *St. Pierre*, 898 F.3d at 360 (internal citations and quotations omitted); *see also Turner v. Cook,* 362 F.3d 1219, 1227 (9th Cir. 2004) (limiting FDCPA's reach "to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services" (quoting *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1326 (7th Cir. 1997))); *Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1371 (11th Cir. 1998) ("[A]t a minimum, a 'transaction' under the FDCPA must involve some kind of business dealing or other consensual obligation . . . .").

No. 19-30558

### ii. The Road Home Program Agreement

Turning to the facts here, the district court determined that "the precise transaction that created the [repayment] obligation was OCD's issuing a grant to Calogero under the Road Home Program, a condition of which was that she agreed to repay any overpayments."

On appeal, SCW mischaracterizes the Road Home grant as simply an unreciprocated donation for which Louisiana and OCD received nothing in return for issuing hurricane disaster relief grants. That description is an oversimplification of the thirteen-page agreement—including a declaration of covenants, limited subrogation, and affidavit—voluntarily signed by Calogero and OCD representatives. It is evident that there was a mutual exchange of value that reciprocally affected and influenced both Calogero and OCD. Through the Road Home Program, OCD provided hurricane relief money to encourage Calogero and many homeowners to return to and reside in Louisiana in the wake of Hurricanes Katrina and Rita. Specifically, in exchange for the OCD grant payment of $33,392.68, Calogero agreed to several conditions that aided Louisiana, such as occupying her property as her primary residence for a period of three years[5]; promising to not sell her property except to a buyer who agreed to abide by the covenants; maintaining property insurance against wind, hail, and flood damage[6]; recording these covenants in the parish records; and providing the State with evidence of her compliance with these covenants. At the very least, the Road Home grant contract between

---

[5] The Road Home Program Grant Agreement specifically notes that the occupancy of property requirement is "a material consideration without which the Homeowner(s) would have received a lesser amount under the Road Home Program. Homeowner(s) will be required to repay the Grant in the event of a violation of this Section[.]"

[6] The Road Home Declaration of Covenants included a covenant that Calogero's "failure to maintain flood insurance could result in repayment of the Grant" and her future ineligibility "for federal disaster relief assistance for repair, replacement, or restoration of damage due to flooding."

Calogero and Louisiana did involve a "consensual exchange": Louisiana gave Calogero money to repair her home, and Calogero gave Louisiana her word that she would comply with the significant requirements set forth in the Road Home grant agreement. *St. Pierre,* 898 F.3d at 360. As SCW acknowledges, the debt at issue here—Calogero's obligation to repay excess grant money— specifically arises out of the Limited Subrogation/Assignment Agreement in which Calogero assigned to the State any recovery of future funds she received from insurance or FEMA "in consideration of [her] receipt of funds under the Road Home Program for Hurricane Katrina/Hurricane Rita victims."

We have previously held that a group health insurer's contract-based subrogation claim for reimbursement of benefits it had paid the plaintiff was a "debt" under the FDCPA. *Hamilton,* 310 F.3d at 385. The consumer in *Hamilton* was covered under an insurance policy that required him to reimburse the insurer for duplicate payments received from another company for the same coverage. *Id.* at 392. We found that the consumer's obligation to pay arose from the consumer's purchase of insurance even though, as the district court observed, "had [the consumer] not engaged in another transaction wholly unrelated to his contract with United, *i.e.*, obtaining his own [underinsured motorist] policy through another insurer, no obligation would exist." *Id.* at 395 n.2 (quoting *Hamilton v. United Healthcare of La., Inc.*, Nos. Civ. A. 01-585, 01-650, 2001 WL 812076, at *3 (E.D. La. July 16, 2001)). It logically follows that Road Home's subrogation claim for reimbursement arises out of Calogero's direct voluntary acceptance of the program's terms, especially when there is no unrelated, separate contract at issue here. *See id.* at 395-98 (Garza, J. dissenting in part) (emphasizing that United's subrogation claim was too attenuated from the underlying contract or transaction).

SCW also urges us to adopt the district court's reasoning which likened Calogero's obligation to repay excess relief funds to an employee's obligation to

10

repay a salary overpayment due to a unilateral accounting error. *See Orenbuch v. Leopold, Gross & Sommers, P.C.,* 586 F. Supp. 2d 105, 108 (E.D.N.Y. 2008) (analyzing an FDCPA claim premised on an employer's attempt to recollect over $2,000 as overpaid salary to an employee); *see also Arnold v. Truemper*, 833 F. Supp. 678, 683 (N.D. Ill. 1993) (concluding that a bank customer's obligation to repay a deposit mistakenly transferred into a bank account was not considered an FDCPA debt because there was no transaction involving an obligation to repay and there was no source of the debt beyond an accounting error). However, the district court overlooked a critical distinction in these cases. Indeed, the Eleventh Circuit importantly noted that neither *Arnold* nor *Orenbuch* involved a contract that created a specific obligation dictating the plaintiffs' liability in the event of any overpayment. *See Oppenheim*, 627 F.3d at 838 ("*Arnold* and *Orenbuch* do not stand for the proposition that one who improperly receives money does not incur a 'debt' subject to the FDCPA. Rather, they stand for the proposition that a consumer's obligation must arise from a 'transaction' in order for the FDCPA to apply."). In this case, Calogero's consent to her obligation to repay excess funds amply meets the "transaction" test and distinguishes it from the cases of overpayment in which there was no explicit consent to repay an erroneous deposit of money.

We of course do not read the term "transaction" in a vacuum. *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019) ("[J]udges, like all readers, must be attentive not to words standing alone but to surrounding structure and other contextual cues that illuminate meaning."). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). We cannot find, nor have the parties pointed to, anything in the FDCPA statute that excludes an obligation to repay excess Road Home funds.

Therefore, we find that Calogero's obligation of repayment for excess grant money arises from a "transaction," which encompasses consensual agreements and negotiations like this one. *See Bass*, 111 F.3d at 1326 (holding that an FDCPA transaction encompasses "consensual" exchanges "where parties negotiate or contract for consumer-related goods or services"). *Compare Shorts v. Palmer,* 155 F.R.D. 172, 175-76 (S.D. Ohio 1994) (obligation to pay for shoplifted merchandise not a "debt" under the FDCPA because "plaintiff has never had a contractual arrangement of any kind with any of the defendants"), *with Romea v. Heiberger & Assocs.,* 163 F.3d 111, 115 (2d Cir. 1998) ("Back rent by its nature is an obligation that arises only from the tenant's failure to pay the amounts due under the contractual lease transaction" and the tenant's "breach" of "its payment obligations in the contract between the parties"). We turn to the next step of the *St. Pierre* inquiry.

## B. The Subject of the Road Home Transaction between Calogero and OCD.

To identify what "money, property, insurance, or services are the subject of the transaction," we must ask "what is being rendered in exchange for payment[.]" *St. Pierre*, 898 F.3d at 362. The district court concluded that "there was no consumer transaction between Calogero and OCD" because "Calogero did not give OCD money for goods or services, or vice versa" and Calogero "would never be obligated to repay unless she broke one of the covenants or received an overpayment."

This is incorrect. Calogero received funds from the government in exchange for contractual obligations, including a promise to repay excess grant money. This exchange of government-backed funds for promises comports with other cases in which we have assumed the FDCPA applies. *See generally Peter*

*v. GC Serv. L.P.,* 310 F.3d 344 (5th Cir. 2002) (applying the FDCPA in the context of collecting student loan payments owed to the federal government).

SCW also maintains that the FDCPA's reach is limited to transactions involving the "normal creditor/debtor relationship." However, such a narrow reading of the FDCPA prohibitively restricts the plain meaning of "transaction." *Hamilton,* 310 F.3d at 390. If Congress had intended to limit FDCPA's definition of "debt" to repayments to creditors or obligations arising out of the exchange of tangible goods, "it could have and would have drafted the statute to demonstrate that intention." *Chance v. Dallas Cty. Hosp. Dist.,* 176 F.3d 294, 296 (5th Cir. 1999); *see also Brown v. Budget Rent-A-Car Sys., Inc.,* 119 F.3d 922, 924 (11th Cir. 1997) (An "extension of credit is not a prerequisite to the existence of a debt covered by the FDCPA"); *Romea,* 163 F.3d at 114 n.4 (noting that several circuits have "disavowed" the "dicta" that the FDCPA applies only to transactions involving the "offer or extension of credit"). The principles of statutory interpretation prohibit us from reading into the FDCPA's clear statutory language a restriction that Congress itself did not include. *See Hubbard v. United States,* 514 U.S. 695, 703 (1995). Accordingly, we find that Calogero "voluntarily elect[ed] to avail h[er]self" of disaster relief money in exchange for her consent to Road Home's covenants and subrogation agreements. *St. Pierre,* 898 F.3d at 362 (quoting *Piper v. Portnoff Law Assocs., Ltd.,* 396 F.3d 227, 233 n.8 (3d Cir. 2005)). Such an arrangement falls within "a classic *pro tanto* exchange." *Id.*

**C. Whether the grant money from the Road Home Program Agreement was "primarily for personal, family, or household purposes"?**

Having identified what Calogero rendered in exchange for the grant money, we next determine if the money Calogero received in exchange for compliance with Road Home's terms was for the private benefit of a "personal,

family, or household" service or good. *St. Pierre*, 898 F.3d at 363 (citing 15 U.S.C. § 1692a(5)). As discussed earlier, the parties do not dispute this prong of the *St. Pierre* test. The Road Home Program was established to provide grants for home repair and rebuilding, support affordable rental housing, and offer housing support services. The Road Home Program's Declaration of Covenants also states that property owners, like Calogero, have "been awarded the Grant as compensation for damages suffered from the Hurricanes."

In sum, we hold that the district court erred in concluding that Calogero's obligation to pay the Road Home Program did not fall under the FDCPA. We make no comment on whether Calogero's claim will satisfy the other required elements to ultimately prevail on her FDCPA claim as those issues were not under consideration of this appeal.[7]

## IV. CONCLUSION

For these reasons, we REVERSE the district court's determination that the obligation of repayment at issue in this case does not qualify as a "debt" under the FDCPA and REMAND for further proceedings consistent with this opinion.

---

[7] SCW also offers two alternative arguments in support of the district court's Rule 12(b)(6) dismissal of Calogero's complaint. SCW maintains that (1) their alleged conduct and communications to Calogero did not violate the FDCPA and (2) that OCD is not a "federal agency" making Calogero's claims subject to Louisiana's ten-year prescriptive period and thus not a collection of a "time-barred debt." We have "authority to consider grounds presented to but not ruled upon by the district court[.]" *Bogy v. Ford Motor Co.*, 538 F.3d 352, 355 (5th Cir. 2008). But we decline further appellate review as the resolution of these issues is tied to factual determinations that extend beyond the complaint's allegations (i.e. the development of the Road Home Program, the federal government's involvement, and specific actions SCW used in attempting to collect the debt). *See id.* (ruling that the district court would benefit from further evidentiary presentation on unaddressed issues). Accordingly, we will remand these alternative grounds of dismissal to the district court for further consideration.