# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2024

Lyle W. Cayce
Clerk

———————————

No. 22-30487

———————————

Iris Calogero, *on her own behalf and on behalf of all others similarly situated*; Margie Nell Randolph, *individually and on behalf of all others similarly situated*,

*Plaintiffs—Appellants*,

*versus*

Shows, Cali & Walsh, L.L.P., *a Louisiana limited liability partnership*; Mary Catherine Cali; John C. Walsh,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-6709

———————————————————————

Before Clement, Haynes, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:[*]

Widowed octogenarians Iris Calogero and Margie Nell Randolph received dunning letters from a Louisiana law firm named Shows, Cali & Walsh. The widows sued under the Fair Debt Collection Practices Act. The

———————————————

[*] Judge Haynes concurs in the judgment only.

district court granted summary judgment to defendant law firm. We reverse and remand.

I.

A.

This case centers on the "Road Home" grant program. As we previously described the program:

> In the aftermath of Hurricanes Katrina and Rita's devastation to displaced homeowners whose primary residences were either destroyed or severely damaged, Congress appropriated billions of dollars through the Community Development Block Grant program ("CDBG") of the Department of Housing and Urban Development ("HUD"). In 2006, Louisiana applied for CDBG funds for the Road Home Program ("Road Home") to provide grants for home repair and rebuilding, support affordable rental housing, and offer housing support services. Upon HUD's approval of the largest single housing recovery program in the United States, the Louisiana Office of Community Development ("OCD") and Louisiana Recovery Authority ("LRA") were tasked with implementing Road Home.

*Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 579 (5th Cir. 2020). OCD in turn outsourced a number of duties to contractors including ICF Emergency Management Services, LLC. ("ICF"). ICF handled individual grant applications, calculated award eligibility, and disbursed funds.

All Road Home grant recipients were required to sign a suite of documents. Breach of any of these agreements could result in demand for repayment by either the federal or state governments. For example, the program required Road Home applicants to disclose repair benefits they previously received. And where Road Home beneficiaries failed to disclose

previous repair benefits, the Road Home Grant Agreement authorized the State to recoup duplicative payments.

## B.

Calogero and Randolph are Louisiana homeowners. In 2005, their homes were devastated by Hurricane Katrina. That same year, Calogero received repair payments from FEMA and her insurance carrier. Randolph also received an insurance payment in 2005.

In the summer of 2007, both women applied for and received Road Home grants. Allegedly, neither woman disclosed the repair benefits she previously received from FEMA or a private insurance carrier. Calogero received a total Road Home grant of $33,393, which closed on May 11, 2007. ROA.6337, 7126. Randolph received a total Road Home grant of $28,793, which closed on June 30, 2007. ROA.6337, 7126.

On July 3, 2007, FEMA reported to the State of Louisiana its 2005 payments to Calogero. ROA.7814, 6338, 7126. A few weeks later, on August 5, 2007, Calogero's insurance carrier notified the State of its 2005 payments to Calogero. ROA.7814, 7229–30. Shortly thereafter, on October 23, 2007, the State received notice of Randolph's 2005 insurance payment. ROA.6129, 8097–98. In March 2008, the State's contractor, ICF, noticed the potential double payments to the two women and placed an internal flag on their accounts in the Road Home database. ROA.7837, 7840.

A decade passed.

Then, in 2017, Shows, Cali & Walsh ("SCW") appeared on the scene. The State of Louisiana paid SCW more than $10 million to help recover double payments made in the Road Home program.

On February 9, 2018, SCW sent Calogero a dunning letter. The reference line stated, "Total Grant Funds Repayment Amount Due: $4,598.89." ROA.7929. The letter explained:

> Our client's records indicate that you received more in total insurance proceeds than the amount used to calculate your Grant award. Since you have not repaid those additional insurance funds to Road Home in accordance with your Road Home Grant Agreement, you have breached your Grant obligations. Those obligations are clearly outlined in your Road Home Grant Agreement.

*Ibid.* The letter demanded payment in 90 days, or else SCW "may proceed with further action against you, including legal action." *Ibid.* It further stated: "[y]ou may also be responsible for legal interest from judicial demand, court costs, and attorney fees if it is necessary to bring legal action against you." *Ibid.*

Calogero, through counsel, disputed the debt. SCW then sent a more detailed letter. In its second letter, SCW changed the basis of the alleged debt from "insurance proceeds" alone to include FEMA relief and a "30% penalty" for "lack" of flood insurance. ROA.7940–42. The Road Home grants make no mention of a 30% flood insurance-based "penalty." ROA.7721–33. And the second letter cites no basis for assessing Calogero a 30% "penalty." ROA.7941.

SCW likewise sent Randolph a dunning letter on August 3, 2017, demanding $2,500. It contained no basis for that figure, other than a reference to her Road Home grant from ten years earlier. Like Calogero's letter, it contained a threat to proceed to litigation in 90 days if the debt was not paid. This threat of litigation also included the possibility that Randolph would have to pay attorneys' fees and other litigation costs.

No. 22-30487

Randolph was "terrified" by SCW's letter and feared that she would lose her house. ROA.7029. She called SCW's office and was told that her only option was to pay the money. Randolph explained that she did not have the money for a lump payment, but the firm agreed to accept monthly payments of $25 if she signed a promissory note. She took that deal for fear that litigation would destroy her financially. She dutifully wrote personal checks for $25, payable to SCW, every month.

## C.

Calogero instead sued SCW under the Fair Debt Collection Practices Act ("FDCPA"). The FDCPA regulates the practices of debt collectors like SCW. The FDCPA's text provides in material part:

> A **debt collector may not use any false, deceptive, or misleading representation** or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> * * *
>
> (2) The false representation of—
>
> (A) the character, amount, or legal status of any debt; or
>
> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
>
> * * *
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> * * *
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt . . . .

15 U.S.C. § 1692e (emphasis added).

5

In applying § 1692e, a court must "view the letter from the perspective of an unsophisticated or least sophisticated consumer." *Salinas v. R.A. Rogers, Inc.*, 952 F.3d 680, 683 (5th Cir. 2020) (quotation omitted). Under that standard, "we do not consider the debtor as tied to the very last rung on the intelligence or sophistication ladder." *Ibid.* (quoting *Goswami v. Am. Collections Enter.*, 377 F.3d 488, 495 (5th Cir. 2004)). We have "generally treat[ed] . . . as a question of law," the application of the unsophisticated-consumer standard. *Manuel v. Merchants & Pro. Bureau, Inc.*, 956 F.3d 822, 826 (5th Cir. 2020) (quoting *Salinas*, 952 F.3d at 683 n.2).

The district court dismissed Calogero's complaint, finding that the Road Home program grants were not debts within the meaning of the FDCPA. *See Calogero*, 970 F.3d at 580. We reversed. *See id.* at 586. On remand, Calogero amended her complaint to add Randolph as a plaintiff. The amended complaint alleged SCW: (1) collected or attempted to collect time-barred debts; (2) failed to itemize the alleged debts; and (3) threatened to assess attorneys' fees without determining whether such a right existed. The parties cross-moved for summary judgment.

The district court granted summary judgment to SCW. It held (1) the alleged debts were not time-barred; (2) the alleged debts did not require itemization, and the dunning letters did not misrepresent those debts in any event; and (3) that SCW could recover attorneys' fees.

Plaintiffs timely appealed. Our review is de novo. *See Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021).

## II.

As always, jurisdiction first. *See, e.g.*, *E.T. v. Paxton*, 41 F.4th 709, 714 (5th Cir. 2022). SCW argues that the widows do not have standing to bring this claim because they lack a concrete injury.

The Supreme Court recently reiterated that: "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Court explained that beyond typical harms like physical and money damages, "intangible harms" may also be cognizable. *Id.* at 425. But an intangible harm is not concrete for Article III purposes unless it has a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Ibid.*

In applying *TransUnion*, we must "focus[] on types of harms protected at common law, not the precise point at which those harms become actionable." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022) (alteration in original) (quoting *Cranor v. 5 Star Nutrition, LLC*, 998 F.3d 686, 693 (5th Cir. 2021)). That inquiry does not look to an exact analog at common law, but rather to harms that are close "in kind, not degree" to those traditionally remedied in American courts. *Ibid.* (quoting *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.)).

This case is controlled by *Perez*. There we recognized that "emotional distress" is a traditional harm that satisfies *TransUnion*'s concreteness requirement. *Id.* at 824 (citing *TransUnion*, 594 U.S. at 434–37). And Calogero and Randolph complained of "fear, anxiety, and emotional distress" after receiving "intimidating" and "misleading" dunning letters. ROA.823. Randolph was so "terrified" by SCW's unlawful threat to sue and by the prospect of losing her home that she agreed to make monthly payments on a promissory note. *See* ROA.7028–30. That is a concrete and cognizable harm under Article III. *See Perez*, 45 F.4th at 824.

SCW's only responses border on frivolous. First, SCW selectively quotes *Perez* to omit the passage that explicitly recognizes emotional distress

as a concrete injury. *See* Red Br. 21–22. Second, SCW claims that Calogero did not establish her emotional distress in her original complaint, so she cannot fix that omission later. It is true, subject-matter jurisdiction "depends on the state of things at the time of the action brought." *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824). But that just means one plaintiff must have suffered emotional distress at the time the complaint was filed—not that failure to plead that injury in the original complaint forever deprives federal courts of jurisdiction. *Cf. Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) ("The state of things and the originally alleged state of things are not synonymous. . . ."). That is why federal law expressly allows plaintiffs to cure defective allegations of jurisdiction—an allowance that would mean nothing if plaintiffs got only one shot, as SCW says. *See* 28 U.S.C. § 1653. "Thus, when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell*, 549 U.S. at 473–74 (citation omitted).

### III.

On the merits, the district court erred in granting summary judgment to SCW. Viewing the facts in the light most favorable to plaintiffs, we hold that a reasonable jury could find that SCW violated the FDCPA in three ways: (A) by misrepresenting the judicial enforceability of the time-barred debts; (B) by mischaracterizing Calogero's debt; and (C) by misrepresenting the availability of attorneys' fees.

### A.

We start with the limitations period. Attempting to collect on a time-barred debt does not *per se* violate the FDCPA. *Manuel*, 956 F.3d at 829; *see also Mahmoud v. De Moss Owners Ass'n, Inc.*, 865 F.3d 322, 333 (5th Cir. 2017) (holding it was not a violation of the FDCPA to collect a partially time-barred debt when only a small portion was subject to the statute of limitations);

*Holzman v. Malcolm S. Gerald & Assocs., Inc.*, 920 F.3d 1264, 1273–74 (11th Cir. 2019) ("[C]ourts generally have recognized that the FDCPA does not impose a bright-line rule prohibiting debt collectors from attempting to collect on time-barred debt."). But a debt-collector can run afoul of the FDCPA by threatening judicial action while completely failing to mention that a limitations period might affect judicial enforceability. *Manuel*, 956 F.3d at 831 (emphasizing that disclosure of a potential limitations problem "might give a consumer at least some inkling that the debt might be too old to be legally enforceable"). As we have explained:

> When a collection letter creates confusion about a creditor's right to sue, that is illegal. The FDCPA singles out as unlawful the false representation of the character, amount, or legal status of any debt. Whether a debt is legally enforceable is a central fact about the character and legal status of that debt. A misrepresentation about the limitations period amounts to a straightforward violation of § 1692e(2)(A).

*Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 512 (5th Cir. 2016) (quotation omitted).

The parties argue at length as to *which* limitations period should apply. The plaintiffs' first assert it should be the six-year federal statute of limitations under 28 U.S.C. § 2415(a). Alternatively, plaintiffs point to a five-year prescription period under article 1564 of the Louisiana Civil Code. On the other hand, SCW contends that Louisiana's general ten-year prescription period should apply. *See* LA. CIV. CODE ANN. art. 3499.

We need not resolve that dispute, however, because the dunning letters were untimely even under the most liberal, 10-year time window. Thus, no matter which limitations period applies, SCW misrepresented the judicial enforceability of these debts by threatening suit without

9

acknowledging its timeliness problem. We (1) explain that timeliness problem and then (2) reject SCW's counterarguments.

1.

Under article 3499 of the Louisiana Civil Code, "a personal action is subject to a liberative prescription of ten years." This includes contract actions. *Taranto v. Louisiana Citizens Prop. Ins. Corp.*, 62 So. 3d 721, 734 (La. 2011).

Normally, the prescription period begins to run when the injured party has knowledge of the "facts that would entitle him to bring a suit." *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002). The State of Louisiana emphasizes that this is not an "actual knowledge" requirement; rather, state law imputes "constructive knowledge" of "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510–11. "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." *Id.* at 511. The general rule in a contract action is that a claim accrues (and hence the prescriptive period begins to run) on the date of the breach. *All. Hosp., LLC v. Esquivel*, 322 So. 3d 253, 256 (La. Ct. App. 2021); *see also Richard v. Wal-Mart Stores, Inc.*, 559 F.3d 341, 345 (5th Cir. 2009) (same, applying Louisiana law).

Here, insofar as plaintiffs breached their contracts with the State of Louisiana, the breach occurred when they closed on their Road Home grants. For Calogero that was on May 11, 2007; for Randolph that was on June 30, 2007. On those dates, the women received their respective Road Home payments. And on those dates, the women allegedly failed to disclose duplicative repair payments they received two years earlier in 2005. So from their closing dates in 2007 (May 11 and June 30), both Calogero and Randolph were suable for breaching their Road Home contracts. Neither

received a dunning letter until over a decade later in either August 2017 (Randolph) or February 2018 (Calogero).

Moreover, FEMA and Calogero's insurance carrier provided *actual* notice to the State of the allegedly duplicative payments in 2007. FEMA provided its notice on July 3, 2007. And Calogero's insurer provided its notice on August 5, 2007. Thus, as to Calogero, the latest conceivable accrual date for the State's claim was August 5, 2007—the date it received notice of the allegedly duplicative payments. Still, Calogero did not receive a dunning letter until over a decade later, in February 2018. Thus, SCW's dunning letter to Calogero plainly violated the FDCPA. *Manuel*, 956 F.3d at 829; *see also Daugherty*, 836 F.3d at 513.

Randolph's situation is slightly more complicated. (But only slightly.) Her insurer provided notice to the State of Randolph's allegedly duplicative repair benefit on October 23, 2007. If that constituted the accrual date for the State's claim, it might appear that SCW's dunning letter to Randolph—dated August 3, 2017—fell within the 10-year prescriptive period. But it did not. In its dunning letter to Randolph, SCW threatened to sue if not paid in 90 days. That 90 days ran until November 3, 2017—and by that time, Randolph's debt would be barred under any conceivable application of the 10-year prescriptive period. Thus, SCW's threat to Randolph (pay us now, or we will sue you in 90 days) was misleading. *Manuel*, 956 F.3d at 829; *see also Daugherty*, 836 F.3d at 513.

2.

SCW offers two counterarguments.[1] Both are wrong.

_____

[1] The district court discussed the equitable doctrine of *contra non valentem*, which it used to toll the prescription period. SCW does not press that argument on appeal. *Cf.*

*First*, the firm claims that "the time period in C.C. art. 3499 does not commence to run until the party becomes aware of the breach." Red Br. 45. For this proposition, SCW cites *New Orleans Jazz and Heritage Foundation, Inc. v. Kirksey*, 40 So. 3d 394, 408 (La. Ct. App. 2010). Applying that standard, SCW claims prescription began to run on March 1, 2008, when the State's contractor, using data it already had at its disposal, internally flagged that Calogero and Randolph may have been overpaid. To SCW, "aware" means the date the State's contractor chose to review existing information and put a notification in its database. Red Br. 45.

This is a misstatement of Louisiana law. *New Orleans Jazz* applied the ten-year period in a straightforward breach of contract case, and the court remarked in passing about the date the plaintiff "first became aware" of the alleged breach. 40 So. 3d at 408. It is obvious from the context of those three words that the court was simply describing the facts of its case—not announcing some new, pathbreaking rule that deviates from the well-settled principle of state law that actual notice is not required. The Louisiana Supreme Court could not be clearer on this point. *Campo*, 828 So. 2d at 510–11 (constructive notice sufficient); *see also Hawthorne Land Co. v. Occidental Chem. Corp.*, 431 F.3d 221, 228 (5th Cir. 2005) (similar, applying Louisiana law). A passing description of the facts in an intermediate appellate court decision cannot somehow overrule the State Supreme Court on a point of state law.

---

*Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (explaining that a party forfeits an argument by failing to adequately brief it). And in any event, *contra non valentem* would likely not apply here, as the Louisiana Supreme Court has warned that it "only applies in exceptional circumstances." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010) (quotation omitted). And none of those "exceptional" preconditions are met here. *Ibid.*

Applying the correct, constructive-notice standard required by Louisiana law, we hold the State had constructive notice of plaintiffs' alleged breach of the Road Home contracts at the very latest when FEMA and the insurance carrier provided notice to the State in August and October 2007. SCW can find no support in state law for its contention that a claim does not accrue until a third party actually studied the notices sent to the State and flagged them. Were it otherwise, the State (or any other contractual counterparty) could stick its head in the sand, sleep on its rights, and otherwise delay enforcing a contract indefinitely. That is the exact opposite of the "reasonable inquiry" required by state law. *Campo*, 828 So. 2d at 511.

*Second*, SCW argues that the Louisiana legislature tolled the normal prescription period, for some undefined length of time, when it supposedly "stay[ed]" OCD's efforts in 2014. *See* Red Br. 46 (citing La. Stat. Ann. § 49:663.1). But § 49:663.1 does no such thing. It simply directed OCD to develop new, robust procedures for grant payment recovery. *See* §§ 49:663.1 (d)–(e). The Legislature's action makes no reference to the judicial enforceability of debts. It says nothing about the prescription period. And SCW offers no authority for inferring that this legislative silence should add some indeterminate amount of time to the prescription period.

## B.

Next, SCW mischaracterizes Calogero's debt. The parties argue at length over whether SCW was required to itemize Calogero's debt in its dunning letter. We need not decide whether the FDCPA requires itemization. *Cf. Manuel*, 956 F.3d at 824 (deciding to "leave for another day" the question of whether a certain practice was "misleading as a matter of law"); *Salinas*, 952 F.3d at 684 ("To date, our court has not settled on precise definitions for the FDCPA terms 'deceptive' and 'misleading.'").

That is because Calogero's letter was misleading and easily transgresses our precedent regardless of its failure to itemize.

Take for example our decision in *Goswami*. In that case, a collection letter falsely advised a debtor that the holder of the underlying debt would only accept a 30% write-down of the principal value, and such an offer was only available for a limited time. 377 F.3d at 495. The client had in fact authorized a 50% write-down at any time. *Ibid.* Our court found a violation of the FDCPA because the dunning letter was deceptive on the true value of the write-down. *Id.* at 496; *see also Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1237–38 (5th Cir. 1997) (finding a debt collector's form letter misleading under the FDCPA because it appeared on law firm letterhead, even though no attorney ever participated in the dunning efforts).

SCW's letter stated that Calogero owed $4,598.89 in "insurance proceeds." ROA.7929. But in reality, it was nowhere close to that figure. When pressed by Calogero's counsel, SCW completely changed that calculation. Upon inspection, most of that $4,598.89 was made up of FEMA benefits. And it included a 30% "penalty" for "lack" of flood insurance. ROA.7941. SCW provided no basis for the "penalty" assessment. *Ibid.* And it is nowhere to be found in the Road Home documents. It is plainly an incomplete and incorrect presentation under 15 U.S.C. § 1692e to represent to a consumer that a debt is for one thing, and then switch justifications completely when pressed by counsel. *Cf. Goswami*, 377 F.3d at 496; *Taylor*, 103 F.3d at 1237–38.

SCW nonetheless contends that the only relevant question is whether Calogero owed the final bottom-line number specified in the dunning letter. If Calogero owed $4,598.89, SCW contends, the rest of the letter is no-harm-no-foul.

No. 22-30487

We disagree. The FDCPA forbids SCW from *misleading* or *deceiving* debtors. 15 U.S.C. § 1692e. "As the addition of the term 'misleading' confirms, the statute outlaws more than just falsehoods. That is why truth is not always a defense." *Buchanan v. Northland Grp., Inc.*, 776 F.3d 393, 396 (6th Cir. 2015) (quotation omitted). If a debt collector hopes to pressure someone into paying a debt, it cannot demand payments on imaginary debts and then escape the FDCPA's reach by pointing to the bottom line. It instead must present the debt accurately.[2]

## C.

Finally, SCW violated the FDCPA by threatening to collect attorneys' fees that it had no lawful basis to recover.

A debt collector violates the FDCPA when it has "no legal basis" for its demand. *See* 15 U.S.C. § 1692e(5) (banning "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken"). Therefore, the question is whether SCW had a legal basis to threaten plaintiffs with attorneys' fees.

Louisiana law follows the "American Rule," under which courts cannot award attorneys' fees unless authorized by contract or statute. *See, e.g.*, *Maloney v. Oak Builders, Inc.*, 235 So. 2d 386, 390 (La. 1970). In interpreting a contractual fee-shifting provision, "[t]he reasonable intention of the parties to a contract is to be sought by examining the words of the

---

[2] The dunning letter SCW sent to Randolph does not contain these same deceptive and misleading flaws. The Randolph letter simply demands payment for $2,500. As to that letter, plaintiffs urge us to hold the letter was deceptive because SCW failed to itemize the $2,500 debt. We need not do so, however, because Randolph's letter was misleading and deceptive both because it unlawfully attempted to recover on a time-barred debt (as discussed in Part III.A, *supra*) and because it unlawfully attempted to recover attorneys' fees (as discussed in Part III.C, *infra*).

contract itself." *Prejean v. Guillory*, 38 So. 3d 274, 279 (La. 2010). And "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Ibid.* (citation omitted).

This case is governed by the "American Rule," because none of the contracts in the Road Home program authorized the fee shifting that SCW threatened. And SCW points to no statute sanctioning the firm's demands. Yet its dunning letters to Calogero and Randolph threatened that the widows would be "responsible for legal interest from judicial demand, court costs, and attorney fees if it is necessary to bring legal action against you." ROA.7927. That plainly violates § 1692e(5).[3]

SCW nonetheless points to one fee-related document in the Road Home suite of contracts—the Road Home Limited Subrogation/Assignment Agreement ("LSAA"). SCW is correct that the LSAA authorizes the State to recover attorneys' fees. But SCW is incorrect that the LSAA applies to either Calogero or Randolph. The LSAA provides in relevant part:

> [T]o the extent of the grant proceeds awarded or to be awarded to me under the Program, all of my/our **claims and future rights to reimbursement and all payments hereafter received or to be received** by me/us (a) under any policy of casualty or property damage insurance or flood insurance on the residence, excluding contents ("Residence") described in my/our application . . . .

ROA.7728–29, 7741–42 (emphasis added). Thus, the LSAA allows for recuperation (and fees) only where the grant recipient receives *future*

---

[3] The attorneys' fees threat is an independent violation of the FDCPA under 15 U.S.C. § 1692e(5). So even if SCW timely dunned some grant recipients for alleged overpayments, any unlawful threats of attorneys' fees would constitute distinct violations of the FDCPA.

payments *after* signing the Road Home suite of contracts. It provides no fee-shifting remedy against grant recipients like Calogero and Randolph who allegedly received payments *before* signing the LSAA.

A separate document in the Road Home suite of contracts—called the "Grant Agreement"—applies to payments received and not disclosed *before* closing. ROA.7726, 7731. And that instrument authorizes fee-shifting in the tightly circumscribed scenario in which a homeowner sued the Road Home program and suffered an adverse judgment. That obviously has not happened here, so the Grant Agreement does not justify the threat in SCW's dunning letters.

SCW's last remaining counterargument is that it should be able to pick and choose different clauses from the LSAA and the Grant Agreement and then mush them together to demand money from debtors. SCW offers no authority for this proposition,[4] but simply urges this court to combine the separate instruments into one. We will not. The words of the LSAA are "clear and explicit": fee shifting can occur only for future payments. *Prejean*, 38 So. 3d at 279. SCW does not dispute that clarity.

---

[4] Although not pressed by SCW on appeal, the district court cited *Robinson v. Marks*, 30 So. 2d 200, 203 (La. 1947), for the proposition that multiple contracts between the same parties can constitute "one entire and indivisible contract or one transaction." *Ibid*. But the rule from *Robinson* has been partially abrogated by statute. LA. CIV. CODE ANN. art. 2053 ("[O]ther contracts of a like nature between the same parties" should be used to interpret only "doubtful provisions."). The provisions at issue here are not "doubtful." *Ibid*. And, in any event, SCW forfeited the point by not pressing it. The district court also *sua sponte* raised a theory of fraud against Calogero and Randolph. SCW forfeited that point too by failing to press it on appeal. *Rollins*, 8 F.4th at 397.

No. 22-30487

\* \* \*

For the foregoing reasons, the district court's judgment is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.